Jason E. Fellner (SBN 245364)
Lindsay Hoopes (SBN 271060)
Andrew Browning (SBN 326778)
FELLNER LAW GROUP
90 New Montgomery St., Ste 1250
San Francisco, CA 94105
Phone: 415.658.9253
Facsimile: +1 415.658.9526
jfellner@fellnerlawgroup.com
lhoopes@fellnerlawgroup.com
abrowning@fellnerlawgroup.com

Attorneys for Plaintiff VICTOR AENLLE

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTOR AENLLE, | Case No.: |
| Plaintiff, | |
| vs. | COMPLAINT |
| COUNTY OF SAN MATEO; MICHAEL CALLAGY, in his individual and official capacity as County Executive Officer (or County Manager); STEVE MONOWITZ, in his official capacity as director of Building and Planning; the BOARD OF SUPERVISORS OF SAN MATEO COUNTY; and DOES 1-20, INCLUSIVELY, | (1)  42 U.S.C. § 1983 – First Amendment Retaliation (U.S. Const. amend. I.) |
| | (2)  Cal. Labor Code 1101, 1102, et seq -- Whistleblower Retaliation |
| | (3)  42 U.S.C. § 1983 – Fourth Amendment Retaliation (U.S. Const. amend IV) |
| Defendants. | (4)  42 U.S.C. § 1983 – Violation of Procedural Due Process (U.S. Const. amend XIV) |
| | (5)  42 U.S.C. § 1983 – Violation of Substantive Due Process (U.S. Const. amend XIV) |
| | (6)  42 U.S.C. § 1983 – Violation of Equal Protection Selective Enforcement (U.S. Const. amend XIV) |
| | (7)  Termination in Violation of Public Policy (Cal. Common Law) |
| | (8)  42 U.S.C. § 1983 – Defamation, plus |
| | (9)  California Civil Code §§ 44, 46 – State Law Defamation |
| | (10) Public Disclosure of Private Facts |
| | (11) Cal. Civ. Code §§ 51, 52 – Ralph and Bane Act Violations |
| | [Demand for Jury Trial] |

## I.    INTRODUCTION

1.      Plaintiff Dr. Victor Aenlle brings this action to vindicate his constitutional and statutory rights, including freedom of speech, political association, and due process, and recover damages. Plaintiff seeks redress for Defendants' wrongful termination, and their retaliatory and retributive selective enforcement, defamation, and abuse of power in violation of 42 U.S.C. § 1983, the United States and California Constitutions, and federal and California law.

2.      Dr. Aenlle further seeks to enjoin Defendants' retributive code enforcement activity against Dr. and Mrs. Aenlle's family home, including threat of imposition of ruinous and unlawful fines, and removal of their residence, without notice or a meaningful opportunity to be heard.

3.      The genesis of the facts giving rise to this claim originate with Dr. Aenlle's support for Sheriff Corpus, an elected reformer who challenged the entrenched political order. His support angered Sheriff Corpus' opponents who conspired to destabilize her administration by targeting him.

4.      Acting under color of law, the County of San Mateo, Defendant Callagy, and its officials terminated Dr. Aenlle's employment as Chief of Staff, deprived him of procedural and substantive due process, and retaliated against him for protected speech and association in support of Sheriff Corpus. Their actions further violated the First Amendment, the Fourth Amendment, and statutory protections.

5.      Defendants' acts to terminate Dr. Aenlle was not grounded in legitimate employment considerations or budgetary concerns but rather were motivated by hostility to his political viewpoints; namely, supporting Sheriff Corpus and her agenda of change, which stood to disrupt the corrupt and nepotic behavior of the San Mateo County Government, to the detriment of those who benefited from it.

6.      Defendants escalated this campaign by weaponizing code enforcement against Dr. Aenlle's personal property, fabricating and disseminating false allegations, and defaming him publicly and professionally — amounting both to defamation and §1983 defamation-plus loss of federally protected rights, ending Dr. Aenlle's government employment. These acts were intended not only to end his employment but to destroy his reputation and career forevermore.

7.      This action seeks to reaffirm the principle that public employees cannot be harassed, defamed, or punished for their political opinions, whistleblowing, or lawful exercise of constitutional rights. Such action, if left unchecked, will substantially chill all political association in conflict with the

status quo.

## II.    PARTIES

8.     Plaintiff Dr. VICTOR AENLLE, Ph.D ("Plaintiff" or "Dr. Aenlle") is an individual residing in the County of San Mateo, State of California. At the time of termination, on November 13, 2024, Dr. Aenlle was San Mateo County's Sheriff's Executive Director of Administration and Chief of Staff, a civilian-led position. Dr. Aenlle was at all relevant times a Peace Officer under Penal Code section 830 and a sworn Designated Level I Reserve Deputy Sheriff 24-Hour Authority for the County, in fact a sworn law enforcement officer. Dr. Aenlle was born in Cuba. Dr. Aenlle is, and classifies himself, as a Cuban Latino male, and a member of a protected class.

9.     Defendant COUNTY OF SAN MATEO ("Defendant" or "County" or "the County") is a Charter County and political subdivision of the State of California, organized under the authority of California Constitution, Article XI, sections 3 and 4, pursuant to the Charter of the County of San Mateo. The County has the capacity to sue and be sued as a municipal corporation.

10.     SAN MATEO COUNTY DEPARTMENT OF PLANNING AND BUILDING ("DPB"), is a department within the county, consisting of a planning division, building division, and with oversight of code enforcement. DPB is comprised of the planning director (STEVE MONOWITZ) and employees (including TIM SULLIVAN), and is authorized by, and subordinate to, the County Board of Supervisors. The director shall have charge of "the enforcement of the zoning ordinances of the county." SMC § 2.60.010, et seq. DPB is tasked with issuing permits, performing inspections, enforcing permits and zoning, maintaining public records relating to permits and enforcement actions, establishing code enforcement operations, policies and procedures, observing code enforcement priorities, selecting appropriate code enforcement procedures, and hiring, training and supervising code enforcement officers.

11.     Defendant MICHAEL CALLAGY ("Defendant Callagy" or "Callagy") is, and at all relevant times was, the County Executive Officer (also known as County Manager) of San Mateo County. Defendant Callagy is appointed by the Board of Supervisors, and is responsible, in whole or in part, for coordinating the work of all offices and departments, appointing the heads of departments unless elected, including the head of DPB. The County Manager does not have authority to appoint,

supervise, suspend and/or remove persons employed by individual departments. (San Mateo County Charter, Art. IV, § 413.) Defendant Callagy directed and/or was instrumental in the termination of Dr. Aenlle's employment, and the unilateral termination of his prior contract, and so is sued in his official and individual capacities.

12.    Defendant BOARD OF SUPERVISORS of the County of San Mateo (the "Board"), is the legislative governing body of the County of San Mateo, a political subdivision of the State of California. The Board possesses the authority to allocate the annual San Mateo County budget and to set the total number of employees for the San Mateo County Sheriff's Office. Defendant Board does not have the authority to appoint, supervise, suspend and remove persons in county departments. (San Mateo County Charter, Art. IV, § 413.)

13.    Defendant STEVE MONOWITZ is head of the Planning and Building Department ("DPB"), and was appointed by the County Manager Defendant Callagy with Board approval. Defendant Monowitz is a county employee charged with administration of County zoning regulations and enforcement of county codes and regulations. (San Mateo County Ordinance "SMC" §§ 2.60.010, 2.60.020.) DPB shall serve as the "enforcement agency" with responsibility of carrying out the duties of an enforcement agency. Defendant Monowitz is sued in his individual and official capacity. SMC §§ 2.60.030, 2.60.040. Defendant Monowitz serves at the direction of County Manager (Defendant Callagy). SMC § 2.60.020(4). Defendant Monowitz by Charter shall have the power to appoint, supervise, suspend, and remove all person in their departments subject to the provision of Article V of the San Mateo County Charter. (San Mateo County Charter, Art. IV, § 413.) Defendant Monowitz is the final decisionmaker of the DBP and oversees code enforcement manager Tim Sullivan. Defendant Monowitz directed the unlawful searches at Plaintiff's property and other unconstitutional acts of the Farm Labor Task Force.

14.    Plaintiff is ignorant of the true names and capacities, whether individual, associate, partnership, corporate, or otherwise, of the Defendants sued herein as DOES 1 through 20 and therefore sues these Defendants by such fictitious names. Plaintiff is informed and believe, and on that basis alleges, that each of said fictitiously named Defendants are somehow responsible or associated in some actionable manner for the damages suffered by Plaintiff. Plaintiff will seek leave from the Court to

amend this Complaint to set forth the true names and capacities of the fictitiously named Defendants once Plaintiff ascertains that information. All references to any Defendant in this Complaint include DOES 1 through 20.

15.     At all times mentioned herein, each of the Defendants named herein were acting as the agents, servants, partners, members, or employees of their co-defendants, and in doing the things hereinafter alleged, were acting within the course and scope of their authority as such agents, servants, and employees and with the permission and consent of each of the other Defendants.

### III.     JURISDICTION AND VENUE

16.     This court has subject-matter jurisdiction because this action arises primarily under 42 U.S.C. § 1983 and the United States Constitution pursuant to 28 U.S.C. §§ 1331 and 1343.

17.     This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

18.     This Court has the authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

19.     This Court has the authority to grant injunctive relief under Federal Rules of Civil Procedure 57 and 65.

20.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because San Mateo County is in this judicial district, and the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

21.      Plaintiff's claim for attorneys' fees and costs are authorized by 42 U.S.C. § 1988.

### IV.     FACTUAL STATEMENT

22.     Plaintiff Dr. Victor Aenlle was employed by San Mateo County and was the Executive Director of Administration/Chief of Staff of the Sheriff's Office at the time the County unlawfully terminated Dr. Aenlle.

23.     Dr. Aenlle is a longtime San Mateo County resident who built his reputation through a willingness to speak out and support candidates that would make tough decisions for the community he lives within and serves. Dr. Aenlle consistently challenged county practices that placed power and politics above taxpayers.

24.     Through his employ, Dr. Aenlle provided support to Sheriff Corpus. Defendants wanted

to remove her. Without ability to readily remove Sheriff Corpus, an elected official, Defendants undertook an unprecedented "investigation" to challenge Sheriff Corpus' administration, with object to abolishing her administration, yet without authority and without due process, starting with Dr. Aenlle, her Chief of Staff.

25.     Rather than engage with Dr. Aenlle's support and concerns in good faith, officials responded by weaponizing their enforcement authority against him, and by retaliating against Dr. Aenlle in his personal life, as to his property, his government employment, and by assassinating his public credibility relative to his personal and professional pursuits to end his career.

**A. The Election of Sheriff Christina Corpus**

26.     Sheriff Christina Corpus ("Sheriff Corpus") served 20 years as a deputy sheriff in San Mateo County. Her professional peril began when she decided to run for her boss's job in 2022.

27.     Sheriff Corpus' opponent, then-Sheriff Carlos Bolanos, suffered a spate of scandal while in office. First, Bolanos was detained in a Las Vegas brothel. Just before the contested election, Bolanos deployed County employees, on taxpayer dime, to raid a "bat-mobile" manufacturer after a friend complained his shipment was delayed. The people wanted a change; the entrenched political status quo of county employees did not.

28.     In a historic victory, Sheriff Corpus was duly elected by the popular vote in June 2022 as the first woman to serve as Sheriff in San Mateo County. The winning margin was substantial, and a surprise to incumbent Bolanos, his supporters, and the status quo, including Defendant Callagy.

29.     Notably, Sheriff Corpus was the first non-incumbent winner of a contested election in San Mateo County in fifty years. Typically, the post, though elected, was effectively handed down. For decades, government positions like sheriff have been endemic of nepotism and political favor within San Mateo County.

30.     Sheriff Corpus campaigned on reforms of the San Mateo County Sheriff's Office, for example, to increase diversity, advocate for child-care, and advocate for institutional change.

31.     Sheriff Corpus would later act on this political platform.

32.     What made Sheriff Corpus popular was also what scared the "good ole boy" network: Sheriff Corpus was an affront to the establishment, as was reform and change. Sheriff Corpus defeated

the well-financed incumbent by popular vote, but the change was not welcome by the reluctant status quo. The victory was a political upset to the incumbent and his seated County supporters holding office and including Defendants.

33.    Shocked at her win, the status quo, including Defendant Michael Callagy, was determined to undermine Sheriff Corpus, and her leadership team, from the outset. Some members of the San Mateo County Sheriff's Office banded together with Chief Executive Officer, Mike Callagy, to thwart and undermine her changes and destabilize her administration.

34.    Plaintiff Dr. Aenlle had contracted with San Mateo County to serve as part of the Sheriff-elect's transition team until such time as Sheriff Corpus was sworn in, and Dr. Aenlle could assume a permanent position. Defendants hoped Sheriff Corpus could not be successful without a loyal team, so quickly became a target of the cabal.

35.    In October 2022, just after the election, County Executive Mike Callagy confronted then-Sheriff-elect Corpus with false rumors that Madame Sheriff and Dr. Aenlle had a romantic relationship, which was false. Defendant Callagy demanded to know who Sheriff Corpus dated in the County; a question that would never have been asked of a male. Sheriff Corpus responded that if she were the previous sheriff (Bolanos, whom Corpus defeated earlier that year), "no one would care. It's the good ole' boys spreading rumors about me because I'm Latina."

36.    Defendant Callagy responded: "You didn't tell me Victor was a good friend. I wouldn't have approved his contract. It's the perception that I hired a contractor who went [on vacation] with the sheriff-elect."

37.    That same day, Defendant Callagy summarily terminated Aenlle's contract. The termination did not follow the terms of the agreement, was without adequate authorization, and without cause.

**B. Appointment of Dr. Aenlle as Chief of Staff**

38.     On January 7, 2023, Sheriff Corpus was sworn in as San Mateo County Sheriff.

39.    As is typical for any newly elected Sheriff, and per authority of the San Mateo County Charter, Sheriff Corpus made new appointments to her command staff. Sheriff Corpus selected individuals who aligned with Sheriff Corpus' policy goals, and in whom she trusted.

40.     On January 31, 2023, Dr. Aenlle signed a one-year contract to work for the Sheriff until a full-time position could be designated and/or designed for him.

41.     Between January 2023 and July 2023, the County Sheriff's Office created the Executive Director of Administration/Chief of Staff ("Chief of Staff") position through a comprehensive human resources process.

42.     Defendant County Executive Officer Mike Callagy, and the Board of Supervisors, approved the position. When Defendants approved the position, they knew it was slated for Dr. Aenlle. Sheriff Corpus had no ability to unilaterally create the position; it was created transparently, and in full cooperation with Defendants. The position was created for Dr. Aenlle; thus, Dr. Aenlle met the qualifications of the position as it was contemplated at origination by Defendant County.

43.     On or about July 2023, Sheriff Corpus appointed Dr. Aenlle to the Chief of Staff position. The position reported directly to the undersheriff and Sheriff (Corpus).

44.     The Meliora Public Safety Consulting Assessment Team, a third-party consultancy, recommended that Sheriff Corpus hire "one civilian Director (Captain equivalent) with prior experience." Dr. Aenlle was hired in alignment with this external organizational recommendation.

45.     Dr. Aenlle was appointed because Sheriff Corpus deemed Dr. Aenlle the most qualified candidate: Dr. Aenlle was passionate about Sheriff Corpus' campaign platform, is a highly educated and well-respected local businessman, as well as a Sheriff's Office veteran who served as a reserve deputy in the Department for seventeen (17) years. Dr. Aenlle championed the campaign and had nearly two decades of institutional knowledge of department operations, both as a sworn officer and as a civilian.

46.     Dr. Aenlle has never received a disciplinary notice, counseling, performance improvement plan, formal discipline, suspension, or dismissal from the Sheriff's reserve deputy program in seventeen years.

47.     Dr. Aenlle is a Peace Officer within the meaning of California Penal Code section 830.

48.     Dr. Aenlle was and remains a sworn Designated Level I Reserve Deputy Sheriff 24-Hour Authority for the County Sheriff's Office. Dr. Aenlle is Police Officer Supervisor Training ("POST") certified, listed as an active "POST" officer. These employment qualifications are recorded with the Sheriff's Office and are indisputable facts.

49.     Sheriff Corpus hired Dr. Aenlle to manage civilian employees of the Sheriff's Office, consistent with modern policing practices, because of his experience as both a reserve deputy, a sworn officer, and businessman and administrator.

**C. San Mateo County's Culture of Nepotism and Corruption Unjustly Ensnares Dr. Aenlle.**

50.     As soon as Plaintiff took his position, Defendants set in motion to destabilize Sheriff Corpus' administration by demonizing her Chief of Staff.

51.     Sheriff Corpus' staffing changes and efforts at reform generated resentment within Defendant County's various offices, including (and in particular) Defendant Mike Callagy.

52.     Sheriff Corpus was the target of the smear campaign; but, in furtherance thereof, Dr. Aenlle personally became the target of harassment, character assassination and retaliation for his support of Sheriff Corpus.

53.     Dr. Aenlle further provided opportunity to destabilize Sheriff Corpus' administration, leaving Sheriff Corpus more vulnerable to attack. Stated otherwise, because Sheriff Corpus had been duly elected, Dr. Aenlle, her closest advisor, was "easier" to remove.

54.     Senior deputies, in concert with Defendant Callagy, started intensifying the whisper campaign of corruption and an affair to set this in to motion. Such allegations were unsubstantiated by any competent evidence and wholly unrelated to operation of the Office.

55.     The tension between Defendant Callagy erupted in to utter chaos when Sheriff Corpus undertook to stabilize the department budget and put a stop to excessive overtime compensation negotiated between Defendant Callagy and the Sheriff's union, without consent, consult or inclusion of Sheriff Corpus .

56.     Sheriff Corpus identified that double-overtime pay far exceeded deputy salaries, was destroying the department budget and created substantial safety concerns for employees and the public. There was a real threat that the double overtime pay would bankrupt the County and was financially unsustainable.

57.     When Sheriff Corpus acted, beneficiaries of the overspending grew angry; they had come to expect the lucrative overtime. Some sheriff's deputies in San Mateo County were earning annual overtime far more than the base salary. One deputy received $168,000 in regular pay in 2024, and

$489,183.94 in overtime. Another deputy, also in 2024, earned $140,000 in regular pay and more than $318,000 in overtime.

58.     In total, the Sheriff's Office would spend $17 million in overtime in the first six months of 2024. If Sheriff Corpus had not put a stop to the double overtime, San Mateo County would have spent $40 million in double overtime in 2024.

59.     Defendant Callagy's ultra vires intermeddling in the overtime budget was not an isolated incident; during Sheriff Corpus' term Defendant Callagy routinely inserted himself into the operations of the Sheriff's Office and set out to destabilize Aenlle's relationship with the labor union. Defendant Callagy had not engaged in similar acts in prior administrations.

60.     Dr. Aenlle was aware that department staff aligned with Defendant Callagy and Bolanos represented a population of predominantly white males, upset with the diversity initiatives in the office, and female leadership. These individuals regularly leaked information and personnel matters to Defendant Mike Callagy, in violation of County and Sherriff Office policy.

61.     When Dr. Aenlle took efforts to blow the whistle in County corruption and seek accountability for terminable offenses committed by Defendant Callagy's cohort, Dr. Aenlle was immediately met with outrage, and later retaliation.

62.     Dr. Aenlle was not intimidated by Sheriff Corpus' political enemies and refused to resign, allay his allegiance, or remain silent. This unfortunately invited more fury against Dr. Aenlle.

63.     Dr. Aenlle would not support the backdoor deals and improper favors that had become synonymous with the prior administrations. For example, on or around March 29, 2024, Supervisor Noelia Corzo ("Corzo") contacted Plaintiff and asked if either he or Sheriff Corpus could override her boyfriend's failed application with the Sheriff's Office. Plaintiff was unable to override the background check to promote the application; it was due to a per se disqualification. This angered Defendant Corzo, and she joined to conspire with Defendant Callagy to remove Plaintiff.

64.     Dr. Aenlle's opinions and political associations with Sheriff Corpus in no way interfered with the discharge of his duties and responsibilities as Chief of Staff and Executive Administrator of the Sheriff's Office. Indeed, Dr. Aenlle was obligated to carry out the Sheriff Corpus' directives and follow her orders. It was that very association, however, that troubled the status quo.

65.     In declining to take a stand against her, and blow the whistle on corruption, for the benefit of the public, Dr. Aenlle invited retaliation from Defendants and suffered the consequences of Defendants improper motives and political wrath.

**D.   The Cordell Report: Trial by Politics and a Theater of Corruption.**

66.     On or about July 2024, Defendant Callagy directed hiring retired Judge LaDoris Cordell ("Cordell") to "investigate" the Dr. Aenlle and prepare a "report." (hereinafter, the "Cordell Report".)

67.     In so doing, Defendant Callagy went so far as to manufacture a method to empower the Board of Supervisors to remove Sheriff Corpus from office and reverse the will of the voters. This was done without notice, a meaningful opportunity to be heard, or even hitting the constitutional floor of due process.

68.     The details of the commission are shrouded in secrecy. What is known is that the report set out to conduct a "fact-finding investigation" of anonymous "complaints and concerns that current and former members of the Sheriff's Office have about Victor Aenlle." The County has refused even to disclose what or how the charge or scope of work was directed to the investigator.

69.     The "investigation" was no investigation at all: the object was unclear, the benchmarks never established, and the entire process without apparent substantive or procedural guidelines. It was also unprecedented, undertaken at great expense, and patently a pretext to discredit and remove Sheriff Corpus, and her team.

70.     Defendant Callagy commissioned the investigation for at least $200,000 of unauthorized taxpayer funds. No other department administration has ever been subject to any similar commission, despite suffering equivalent or far worse "complaints and concerns."

71.     All witnesses were anonymous. The process for witness identification is unknown, though patently lacks political independence: there was no explanation of how witnesses surfaced, or what criteria governed their selection. Plaintiff is informed and believes Defendants unilaterally selected and transmitted witnesses to the factfinder.

72.     Notably, Dr. Aenlle was not permitted to provide a witness list. Dr. Aenlle recommended other individuals for investigation, but Cordell denied this request. Other witnesses offered to sit for interview through other means but were also denied.

73.    All interviews occurred by phone, were unrecorded and without transcription. The factfinder did not undertake to assess witness demeanor or verify witness identity. Many interviews were not cited, leaving reviewers unable to determine whether they were irrelevant, insufficiently credible, or merely inconvenient to the report's thesis or negotiated purpose.

74.    No notes, reports or documentary evidence underlying the "testimony" has been released, inclusive of how Cordell confirmed the identity of the witnesses, or considered motives or connections to the Sheriff, Dr. Aenlle, and/or the mounting political campaign against them.

75.    Without tapes, transcripts, or even contemporaneous notes, no reviewing body can substantiate or replicate any factual findings. There is no opportunity to probe the conclusions from source document. The report supplies no names, dates, emails, documents or other corroboration to permit independent testing or authentication of the content. As a respected jurist has since announced, this shadow report "remains a black-box narrative, anonymous voices … in unrecorded interviews."

76.    The "investigation" did not subject the witnesses to cross-examination, introduce rebuttal evidence, or allow Plaintiff's counsel to be present during the testimony of any witness.

77.    The investigation led to a "report" that called for the Sheriff's resignation, and immediate termination of Plaintiff, without ensuring even the most basic due process rights. The rights subject to deprivation were grossly disproportionate to the (lack of) process. The process and resulting report collapsed distinction between factfinder/investigator and advocate, which further exposed clear confirmation bias to the payee of the report, Defendant Callagy, that cannot be tested because there is no record to review.

78.    Defendants knew the conclusions were untrue but had manipulated the evidence to obtain a specific result, seeking out only witnesses antagonistic to Plaintiff, and putting them in front of the reviewer without cross-examination.

**E. The County Takes to Collateral Attacks and Defamation in a Comprehensive Assault to Malign Dr. Aenlle Personally and Professionally and Bolster their Unlawful Acts.**

79.    Between July and November 2024, the County also waged a coordinated retaliation campaign to further harass and intimidate Dr. Aenlle, deprive Plaintiff of his employment, and in coordination with Defendants' efforts to destabilize the Sheriff. Defendants engaged in selective

enforcement and unequal treatment that pervaded every aspect of Dr. Aenlle's life, causing substantial harm to him, his wife, Marina Aenlle, and his tenants.

80.    For example, Defendants disavowed their legal obligations to Plaintiff, like refusing legal representation to Plaintiff owed by state law.

81.    For example, Plaintiff was subjected to arbitrary, malicious, and intentional discrimination by various County code compliance officials and inspectors, including Defendant Steve Monowitz, Department Head of the Planning and Building Department, and at direction of Defendant Callagy.

82.    Under the guise of the Farm Labor Task Force, Defendant Monowitz pretextually sought access to Plaintiff Dr. and Mrs. Aenlle's family residence and property.

83.    Defendants threatened legal action against his (non-farm) tenants to gain access and as pretextual basis to search for evidence of code violations – actual or imagined – they could use to support their narrative of Dr. Aenlle's "lawlessness" and disregard for his public office.

84.    The Farm Labor Task Force knowingly did not apply to Plaintiff's property, as Plaintiff does not maintain farming operations, or house employees.

85.    Defendants knowingly sought to cause harm to Dr. Aenlle's employment, financially, and as to his property rights, thus violating his First Amendment right (retaliation for political association and free speech), Fourth Amendment rights (entering his property without probable cause), and Fourteenth Amendment (to assist in terminating his government employment).

86.    These code enforcement actions and alleged violations were publicized in the media at the direction of Defendant Callagy to fuel the political fire against Dr. Aenlle, and despite explicit policies against release of investigatory materials.

87.    The coordinated intimidation continued.

88.    On September 20, 2024, the Sheriff's Office fired Ryan Monaghan, an Assistant Sheriff. Defendant Callagy is Monaghan's mentor and has had a close personal relationship with Defendant Callagy for decades. Defendant Callagy halted Monaghan's termination, despite the lack of authority to do so, and created a new assignment for Monaghan with the County, paying him $300,000 per year while on leave and awaiting a new position. Ironically, the creation of an unprecedented position for a friend

is precisely the accusation Defendant Callagy lodged against Corpus and as to Plaintiff's "misconduct." No action has been taken as to Defendant Callagy.

89.    This official department act triggered additional retributive action against Dr. Aenlle, personally, though Dr. Aenlle did not terminate Monaghan.

90.    On or around September 24, 2024, just four days later, the County claimed code violations on the property as to decades old buildings, without stating how or why these violations were spontaneously identified or under investigation. The violations were not identified in reference to codes or any factual basis establishing violations, or legal or factual basis justifying the spur of the moment investigation and unauthorized, warrantless entries.

91.    Notably, all the communications were directed to Dr. Aenlle, and without any notice or respect to Dr. Aenlle's wife, the multi-generational owner of the properties. Marina Aenlle's family had owned the property for 128 years, dating to 1906. Defendants took to harm Dr. Aenlle, no matter the cost.

92.    To clarify: the Farm Labor Housing Compliance Task Force ("Task Force") was set up in 2023 and comprised of inspection and compliance personnel from multiple County departments. The Task Force had two goals: 1) proactively identify and locate all farmworker housing on agricultural lands; and 2) inspect such housing and ensure that all units comply with minimum health and safety standards.[1] The task force set out to improve living conditions of farmers who reside in "employer-provided housing."

93.    San Mateo County utilized the Farm Labor Housing Compliance Task Force as a pretext to gather evidence entirely unrelated to farmworker housing on Mr. Aenlle's property, in violation of the Fourth Amendment.

94.    Dr. Aenlle does not have any Farm Labor Housing on his property, as it has been defined by Defendant County. Dr. Aenlle has two tenants, one who has lived on the property since the 1970's, and the Contreras family who has lived on the property since September 1980.

95.    The Task Force did not cite the legal authority justifying entry of the property upon

---

[1] https://www.smcgov.org/planning/farm-labor-housing-compliance

arrival, or to Plaintiff's tenants. Defendants continued to say that the Task Force authorized them to search beyond the stated basis of the Task Force, which was itself without actual administrative authority, or appropriately defined administrative process. After pretextually gaining access, Defendants continued to pursue additional searches, all originating in justification for the original unlawful access.

96.    Sheriff Corpus was also approached by County Counsel's Office and was advised that if she just fired Plaintiff, "all this would just go away."

97.    On or around October 4, 2024, Defendant Callagy, through his deputies and employees, released information to the media about the pretextual search of Dr. Aenlle's property to give the appearance to the public that Dr. Aenlle was maintaining below-standard farm labor housing, was breaking the law, had disregard for the law, and was a slumlord. This clearly set out to malign Dr. Aenlle related to his employment in law enforcement.

98.    In so doing, the County maliciously released facts they knew to be untrue, including photographs that not of farm labor housing or even of Dr. Aenlle's property, with intent to mislead the public. Defendants directed publication of false reports, allowed false and misleading information to remain in the public, and they continue to refer to these knowingly false facts in support of their adverse employment actions.

99.    The County also released non-public, confidential investigative information to third-parties, including the media, with the intent that the media release this information about Dr. Aenlle and discredit and disrupt his public image.

100.    Just one month later, on October 25, 2024, Dr. Aenlle responded to the allegations of violations on his property through substantial documentary evidence of pre-existing structures, historic property use, decades old aerial photos, County tax assessor's records, and geotechnical reports disputing all claims. The County summarily dismissed the documents, stating the reply was "insufficient" without further explanation. None of this cooperative or corrective material was disclosed to the County.

101.    Also in October 2024, Sheriff Corpus met with County Director of Human Resources, who pressured Sheriff Corpus to terminate Dr. Aenlle. Human Resources "requested" Sheriff Corpus place Plaintiff on administrative leave pending the Cordell Investigation. The County did not identify a lawful justification to the request, provide a factual basis, or propose an investigation. Sheriff Corpus

did not believe there was a lawful basis to recommend administrative leave, and advised that it would be a departure from prior to department practice, and was without evidentiary support.

102. In November, Defendant Callagy directed code enforcement officers again to search private property under the guise of information allegedly gleaned from the pretextual Farm Labor Task Force investigation. As a result of the unlawful, and warrantless entry of the Task Force on Dr. Aenlle's property, Dr. Aenlle found himself in the crosshairs of a relentless code enforcement action, seeking as much to demolish his personal residence.

103. On or about that same time, Sheriff Corpus received a phone call from county-employee Iliana Rodriguez advising her that the County would take actions against Plaintiff's private property. Sheriff Corpus responded that she did not understand this to relate to Plaintiff's role with the Sheriff's Office and affirmed that the actions were improper from a law enforcement perspective.

104. On or about that same time, Sheriff Corpus also received a phone call from County Counsel advising her that the County would take actions against Plaintiff's private property. Sheriff Corpus responded that she did not understand this to relate to Plaintiff's role with the Sheriff's Office and affirmed that the actions were improper from a law enforcement perspective.

**F. The Report is Released to the Public and Utilized to Terminate Plaintiff though Knowingly False, and Lacking in Required Due Process Safeguards.**

105. Defendant Callagy presented the Cordell Report to Defendant Board and the public, with full awareness of the procedural shortcomings, lack of lawful basis, and factual inaccuracies, with intent to enable removal and/or termination of Plaintiff's employment with the County. This is with knowledge that Defendants lacked authority to take similar action: Defendants devised this plan to end-run this lack of authority to terminate the Sheriff and Plaintiff and did so knowing the process was absent of constitutional safeguards necessary for equivalent action.

106. On November 13, 2024, Defendants Callagy, and the Board, officially released the Cordell Report with a public declaration of no confidence in the Sheriff, an official request for her to resign, and in support of an amendment to the San Mateo County Charter to "allow removal of the Sheriff by the Board of Supervisors on a finding of good cause" based on the "findings" in the report.

107. This declaration was incongruent with the stated basis to "investigate" Plaintiff. On its

face, this public declaration exposed the improper purpose of the investigation as a concerted effort to destabilize the Sheriff's Office, and remove Sheriff Corpus, in violation of public policy, and without lawful authority. This end object was further targeted at Plaintiff from the outset as her closest political ally.

108.    This same day, citing basis in the Cordell Report, Defendant Board also de-funded Plaintiff's position, terminating his employment. This entire process was knowingly utilized to end-run Defendants' cumulative lack of legal authority to terminate Dr. Aenlle, a member of Sheriff Corpus' staff.

109.    The Board declared they did not believe Dr. Aenlle was suitable for other positions in the office that Sheriff Corpus slated for Dr. Aenlle should Defendant County defund her Chief of Staff position, which the Sheriff anticipated.

110.    That same day, Defendant Callagy also publicly announced that Plaintiff was barred from spaces reserved for authorized personnel. This item was not on the agenda, in violation of California's Ralph Brown Act. Relying on SMC 2.10.080, Defendants claimed authority to prohibit Dr. Aenlle— specifically and solely—from County buildings, treating the ordinance as the equivalent of a restraining order. In so doing, Defendant Callagy unilaterally imposed a stay-away order without judicial, legislative, or other lawful authority, and without due process. The ordinance grants no authority to unilaterally ban individuals or take similar action.

111.    This unprecedented act was intended to undermine public confidence in Plaintiff and create the false impression that Plaintiff had broken the law and was dangerous

112.    The adverse employment action was made for improper purpose for Dr. Aenlle's support for Sheriff Corpus, with unique animus for Dr, Aenlle, his unpopular political positions averse to the status quo, and as a conduit and/or catalyst to unseat an elected official through improper means.

113.    Defendants recklessly relied on the report, in some cases stating they did not read it, but trusted their colleagues in undertaking unprecedented acts adverse to Plaintiff employment.

114.    Defendants did not caution reliance, or direct anyone relying in the report, as to the procedural and factual inadequacies supporting the adverse actions taken.

115.    The resulting report was released to the public without further investigation or due

process.

116.   The Board of Supervisors utilized the report to justify actions to terminate Dr. Aenlle without further investigation or due process.

117.   Notably, it was also done with the obvious intent to manipulate the content to the public. For example, when Defendants released the report to the public and media, Dr. Aenlle's transcript – the only testimony transcribed – was missing at least 29 pages of exculpatory testimony. The clear purpose was to withhold testimony helpful to Plaintiff, contextually or materially manipulate public interpretation of the document, and to discredit Plaintiff and Sheriff Corpus in the eyes of the public, without a full and fair record, and to bias or obscure Defendants otherwise unlawful actions, including with respect to deprivation of Plaintiff's employment.

118.   The report's conclusions were obviously false.

119.   In notable part, the Board of Supervisors publicly identified that Dr. Aenlle was unsuited for his job because of improper handling of a building lease, because this was a conflict of interest. The "facts" were demonstrably untrue and knowingly false. These falsehoods were or should have been readily apparent to Defendant Callagy, if not Corzo and Mueller, in reading the report.

120.   Defendants know Plaintiff did not negotiate any real estate contract, or benefit from a lease, because Defendant Callagy himself oversaw the transaction, it was carried out by his direct report, and it is readily apparent that CBRE is not Coldwell Banker, where Plaintiff had unrelated ties, are entities that have publicly verifiable distinct entity existences.

121.   Similarly, the Board identified that Dr. Aenlle impersonated an officer, unlawfully displayed a badge, and was dangerous, as evidence of professional misconduct. These "facts" were demonstrably untrue and knowingly false. These falsehoods were or should have been readily apparent to Defendant Callagy, if not Corzo and Mueller, the Board sponsors of Dr. Aenlle's removal, in reading the report.

122.   In releasing same to the public, Defendants have given the public the impression the report is reliable, and in fact, Defendants have used the report to justify their adverse employment actions, despite knowing the contents are false and misleading. Defendants know or should have known that Plaintiff never violated any law, or discipline relating to his duties as a Reserve Deputy or as Chief

of Staff.

123.    For example, Defendants know that Plaintiff is a sworn law enforcement officer and has never impersonated an officer or committed any crime, yet have intentionally failed to correct the report, or the findings, to the public. Defendants knew Plaintiff remained an authorized reserve Sheriff Deputy yet misled the Board and the public by asserting otherwise.

124.    In stated reliance on the report during public hearing, which Defendant Callagy must have known contained false facts, Defendant Callagy unilaterally created a stay away order, without judicial or legal authority, with the intent to deprive Plaintiff of access to necessary areas for his employment and to give the false impression Plaintiff was dangerous and unsuitable for his job.

125.    In alleged reliance on the report, Defendant Mueller represented that Dr. Aenlle was unsafe, was not lawfully allowed to wear a badge or carry a gun, and that Dr. Aenlle was a threat to his coworkers and the community. Mueller vouched for the County's actions – despite lack of fiscal or lawful authority to undertake them – stating Dr. Aenlle's investigation and removal were necessary so the public did not have to worry that "somehow someone with a badge and a gun is going to take action … against the head of a union" or "that person with a badge and a gun is going to demand loyalty of that person."[2]

126.    Defendants' statements during the public meeting gave the public the false and impression that Plaintiff was a danger to the County and/or had no authority to enter even though Plaintiff retained the authority to enter as a sworn reserve officer independent of his role as Chief of Staff. As a reserve Sherrif, Plaintiff remains an active member-in-good-standing, of the Sheriff's Office, legally authorized with access to all buildings. Indeed, he must enter the buildings to carry out these duties.

127.    The Cordell Report's factual deficiencies relative to the above defamatory claims are patently obvious.

128.    For example, that Reports' conclusion that Dr. Aenlle and the Sheriff carried on an intimate relationship so corrosive it crippled the Sheriff's Office. This conclusion rests on a single-sourced hearsay statement. The witness was not cross-examined or evaluated for reliability of the

---

[2] Public Archive of November 13, 2025 Public Hearing of the San Mateo County Board of Supervisors, available at https://sanmateocounty.granicus.com/player/clip/1528?view_id=1&redirect=true, last visited September 15, 2025.

statement or bias. There was no review of independent evidence to corroborate the accusation. The conclusion lacks evidentiary support for existence of the affair itself, let alone the wild conclusion (based on that fact alone) that the elected official improperly "relinquished control" of an approximately 800-employee agency to Dr. Aenlle due to the amorous relationship, and how that was accomplished through an affair. In publishing these false facts (and unsupported allegations based solely thereon), Defendants have given the public the impression the harmful conclusion is reliable, despite knowing the contents are false, inadequately and/or insufficiently supported, and/or misleading.

129.    Despite the length of the report, it is absent identification of acts of "misconduct" beyond conclusory statements. There are no factual underpinnings to the provocative salvos of lies and cheating, and even if the affair is true, for example, there is no nexus or relevance to Dr. Aenlle's suitability for his position as Chief of Staff. When distilled, the alleged accusations of footsie, sweet nothings, and a vacation with the Sheriff, do not relate to professional misconduct by Plaintiff relative to his roles and duties of administration of the office.

130.    The Cordell Report does not untangle what defines misconduct, identify what Dr. Aenlle did, as opposed to the Sheriff, to enable consideration of how that impacted his employee duties. The allegations are completely disconnected from Dr. Aenlle's competence in this role and/or blur chronology, timeline, and causation, so provide little opportunity to identify what conduct was approved, directed by, or even relevant to Dr. Aenlle's duties as Chief of Staff.

131.    There was no identification of a rule or benchmark that prohibits Plaintiff, as a civilian, from occupying the position of Chief of Staff (or assistant sheriff); yet, Defendants publicly accused Plaintiff of lack of qualification.

132.    As a result of the Cordell Report, Defendants took action to terminate Plaintiff, deny him access to areas of required access for his position as a reserve deputy, disable future employment in any alternative government position, and instructed the public that Plaintiff committed a crime and was a dangerous person, when they knew this all to be untrue or unsupported by credible, if any, facts.

133.    Despite clear inadequacies with the procedure and findings in the Cordell Report, the County continues to rely on it as evidence of Dr. Aenlle's "unsuitability" for employment (terms not defined) and in support of continued public character assassination with intent to undermine his

professional and personal credibility as to any current or future government employment.

134.    Defendants have taken no efforts to correct these facts they must know to be false.

135.    In releasing same to the public, Defendants have given the public the impression the Cordell Report is reliable, and in fact, Defendants have used the report to justify their adverse employment actions, despite knowing the contents are false and misleading.

136.    Defendants used the Report to make lend credibility to these false and unsubstantiated allegations publicly, and weaponized the rigged process in pursuit of Dr. Aenlle's removal in his employment to put an end to his career forevermore.

137.    Defendants directed the Cordell Report be released to the public, and the media, despite the known deficiencies and falsehoods. Public release of this information undoubtedly influenced and diminished the public's perception of Plaintiff's suitability for employment to end his career.

138.    Defendants released the report as though they were official findings and statements of professional unsuitability, although these findings were never made by a body or arbiter statutorily authorized to make these findings and/or even assess, supervise, or reprimand Plaintiff in his role as Chief of Staff.

139.    Even the release to the public lacked transparency: when Plaintiff inquired about missing pages of his transcript, Plaintiff was advised the errors would not be corrected because the exculpatory information was under a "protective order." There was no authority for a protective order.

140.    In directing the creation and releasing of the Report, Defendant County Executive Officer Mike Callagy conspired with others to defame, retaliate against, and remove Dr. Aenlle from his duly appointed position as Chief of Staff and bar any future employment with the Sheriff's Office (which the Sheriff intended to convey and maintain, as was her right).

141.    Given the improper object and commission, Dr. Aenlle never stood a chance to obtain neutral evaluation. Dr. Aenlle did not have notice of the purpose, standards, and allegations, let alone opportunity to be meaningfully heard.

**G. Dr. Aenlle's Efforts to Cooperate and/or Terminate Other Retaliatory Law Enforcement Actions is Unavailing.**

142.    On November 13, 2024, Plaintiff received written notice from Defendant Callagy that he

was not permitted to enter non-public areas of the Sheriff's Office, which would disable him from performing his duties as a Reserve Sheriff, independent of his role as Chief of Staff. This impugned Plaintiff's public and professional reputation, frustrated his job responsibilities, and his ability to adequately prepare a defense.

143.    For example, upon presentation for Plaintiff's responsibilities as a Reserve Sheriff, other employees of the Sheriff's Office reported Platiniff for being on the premises, and in turn exposed his presence to the media, including information about his access to firearms. The misleading allegations gave the public impression that Dr. Aenlle was dangerous and accessing areas armed, posing as a threat to public safety. Despite efforts to correct these misunderstandings and urge correction, Defendant's took no action.

144.    The failure to correct this false information has created a public safety concern for Dr. Aenlle, potentially triggering other law enforcement personnel into erroneously thinking he is not allowed to be armed, or in places necessary for his Reserve Deputy status, that could rise to violence amongst armed law enforcement personnel. Defendants' inaction has put Dr. Aenlle at risk for his personal safety.

145.    On November 19, 2024, Defendants continued the campaign to remove the Sheriff, taking the unprecedented act of sponsoring an ordinance (Ordinance 4899) for a special election to take place for the sole purpose of amending the San Mateo County Charter and empowering the Board to remove Sheriff Corpus. The proposed Amendment was named "Measure A."

146.    Since Sheriff Corpus had been elected by the popular vote, the amendment to allow removal by the Board of Supervisors was a not-so-thinly veiled effort to usurp the power of the voters. This is evidenced by the fact that the amendment to remove a Sheriff pursuant to the proposed Measure A procedure terminates when Sheriff Corpus' term ends. (Article 412.5(e), Sunset Provision.) The amendment was further not otherwise lawfully enacted.

147.    On November 22, 2024, Plaintiff took to a public forum to discuss the improper political motives behind removal of the Sheriff, and how the attacks on Plaintiff, and the Sheriff's leadership team, were politically motivated for the Sheriff's reforms of the office and budget.

148.    This angered the County. They continued to aggressively attack Dr. and Marina Aenlle's

property claiming code violations without clearly identifying what they were or how to fix them and simply threatening substantial fines and consequences without providing a path to resolve them.

149.    On December 11, 2024, Dr. Aenlle installed a fire department lock box and paid all fees identified in the notice of violation. The County fire department signed off on compliance. Nevertheless, the County refused to acknowledge this compliance.

150.    In or around January 2025, Dr. Aenlle submitted documentary proof of all health and safety corrections indicated by the Environmental Services and Code compliance departments in the September notice of property violations (again, without accepting liability for the allegations, but determined to cooperate). These corrections were documented by way of inspection reports approved by the relevant county departments. No further problems were indicated at this time. Nevertheless, the County ignored these efforts in cooperation and continued to state Plaintiff did not make efforts to comply with or correct errors the County continued to refuse to identify.

151.    On March 18, 2025, Dr. Aenlle and his wife, Marina Aenlle, attempted to submit various permit applications, not in admission of liability, but again to work in good faith to amicably resolve any confusion about the allegedly unpermitted structures. The County frustrated this process by refusing to open permit applications, advise what was necessary to initiate the permitting process, or even identify what, exactly, required permits or testing.

152.    Dr. and Mrs. Aenlle reached out to various land use consultants desperate for advice on how to work with the County and fix any County concerns. The consultants were unable to provide advice because the consultants indicated the County's directives were vague and lacked identifiable compliance benchmarks.

153.    On May 2, 2025, Dr. Aenlle filed a Claim Against the County of San Mateo, as required pursuant to Government Code section 910. Dr. Aenlle filed this complaint to privately address claims against the government in a non-public forum. Dr. Aenlle did not disseminate this claim to the public, nor is it typical to do so.

154.    In response, San Mateo County posted a public notice on the internet addressing the private claim process between Plaintiff and the County stating affirmatively that Plaintiff's claims about retaliation and code activity relative to his property "appears to spread false information" and contains

"numerous inaccuracies."[3] The County Executive Office advised the public that they should not treat these claims "as credible."[4]

155.    The County Executive Office referenced "media reports" that "have extensively detailed serious concerns about the condition of Dr. Aenlle's property." At the time this statement was made, Defendant Callagy knew this information was false.

156.    Airing government tort claim applications in a public forum is not common practice and was done to publicly malign Plaintiff in his professional capacity, and with respect to his personal and professional credibility.

157.    On June 26, 2025, Defendant Michael Callagy, on behalf of Defendant County, rejected the tort claim "in its entirety." (Ex. A: June 26, 2025, Tort Claim Letter Rejection.)

158.    Plaintiff is informed and believes that San Mateo County created the false reports relating to his property (and that of Marina Aenlle) and transmitted the reports to the media to establish to facilitate untruthful and biased reporting to malign Plaintiff and support the unlawful deprivation of his employment.

## H. Fearing the Unreliability of the Cordell Report, the County Implicitly Backtracks on False Statements Made, but without Public Correction.

159.    The County undertook production of a second "investigatory report" because Plaintiff is informed and believes that the County knew the Cordell Report was unreliable, deficient, unfounded, and could not withstand due process or judicial scrutiny.

160.    The San Mateo County District Attorney, for example, advised that the report lacked credibility. Independent reports flagged the same concerns. (Ex. B: April 24, 2025 Former Judge Burke E. Strunsky Report.)

161.    Defendants deployed an additional unauthorized sum, that Plaintiff is informed and believes was akin to the $200,000 paid to the factfinder of the Cordell Report, to pay for a second investigatory report. The second investigatory report was commissioned to establish a Notice of Intent

---

[3] See, e.g., May 8, 2025, "Numerous Inaccuracies in latest claim by Victor Aenlle," Statement of the San Mateo County Executive's Office, available at https://www.smcgov.org/ceo/news/numerous-inaccuracies-latest-claim-victor-aenlle, last viewed September 17, 2025.

[4] *Id.*

to remove Sheriff Corpus and was prepared by Keker, Van Nest & Peters ("the Keker Report").

162.    The County hired and paid Keker, a private law firm, to conduct a second unauthorized and unprecedented investigation pursuant to an unlawfully enacted ordinance (and in ex post support of removal of her Chief of Staff).

163.    The Keker Report contradicted the Cordell Report in various ways.

164.    Notably, the Keker Report retracted that Dr. Aenlle and Sheriff Corpus has an amorous relationship, admitting the relationship was a "close personal" one – as Dr. Aenlle had always maintained. This correction was never directed to the public to correct the Cordell Report's improper and unfounded conclusions of Plaintiff's want of chastity to the public, or the Board.

165.    The Keker Report also abandoned the allegation that Sheriff Corpus made "racial and homophobic slurs," presumably knowing these allegations were without evidentiary support and merit. The Board nevertheless publicly attributed these same slurs to Dr. Aenlle during public hearing on November 13, 2024. These allegations were never publicly retracted as to Dr. Aenlle or Sheriff Corpus, though were knowingly never supported by competent evidence.

166.    The Keker Report suffers similar procedural errors to the Cordell Report and makes similarly unsubstantiated reference to lack of qualification for the Dr. Aenlle's position as Chief of Staff. As previously noted, the position was created in the first instance for Dr. Aenlle, with Defendant's approval, and the conclusion was made without reference to any definition, enumeration of "qualifications" applied to the role, or acknowledgement of Defendants role in creation thereof.

167.    Despite these material corrections, and implicit admissions of inadequacies, the County continues to refer to the Cordell Report in support of their allegations of "misconduct," arbitrarily and maliciously, and despite knowledge they are informed and believe the reports are inadequate and unsubstantiated.

168.    The County did not correct the representations the County made about Dr. Aenlle to the on the basis of the Cordell report. Later retracted.

169.    None of the witnesses interviewed for the Keker Report were placed under oath, and their statements were also not transcribed. Like the Cordell Report, the witnesses were not subject to cross-examination. Unsurprisingly, the law firm the County hired to generate a report sent a report in favor of

1  the County's desire to oust the Sheriff.

2  **I.  The County Building Department Starts Threatening Unconscionable Harm to Dr.**

3  **Aenlle's Property to Retaliate Against Dr. Aenlle and Seeks to Require Fines and**

4  **Demolition without Due Process.**

5  170.    The Torello Family – Dr. Aenlle's wife's family – has owned the subject property for 128

6  years, since 1906. Indeed, the roadway is named Torello Canyon Road, as the family served as the

7  original stewards of this land. Dr. Aenlle's wife's is a descendent of the Torello family and has occupied

8  the subject property her entire life.

9  171.    Defendants do not seek resolution of any actual (or imagined) property violations and

10  hope instead to harass and take property rights from Dr. Aenlle (and his wife) for improper motive,

11  without authority, and without due process, and in retaliation for his support of Sheriff Corpus.

12  172.    In effect, the County has made compliance with unidentified objectives with

13  unreasonable timelines impossible to harm Plaintiff, cause financial hardship, and cause loss of property

14  rights, amongst other things.

15  173.    The County has endeavored to treat Plaintiff differently than other residents, inconsistent

16  with policies and procedures, written and unwritten, as typically applied to all other residents.

17  174.    Plaintiff has presented as a target of the County's enforcement ire due to his political

18  association, speaking up against Defendants in their official capacities, and for undermining their efforts

19  to curry financial and personal benefits to their supporters and/or families.

20  175.    The timeline of the concerted code enforcement efforts, and use of the code enforcement

21  activities in support of the Sheriff and Plaintiff's removal from employment and public censure,

22  demonstrates a clear interwoven and coordinated effort to attack Plaintiff's credibility through improper

23  law enforcement activities.

24  176.    For example, Defendants have gone so far as to encourage the Sheriff to terminate

25  Plaintiff relating to maintenance of his private property and impugn his character by misleading the

26  public to believe he is a slumlord of farm workers. Defendants have used alleged land use activity to

27  justify Plaintiff's termination as "misconduct" and as related to Plaintiff's employment in the media and

28  to the public.

177.     Dr. Aenlle and Mrs. Aenlle do not have any qualifying Farm Labor housing on their property. When Defendants entered the property, they knew this to be true, and entered with the pretextual purpose to end-run the warrant requirement, and enter without probable cause, or administrative authority.

178.     Land use consultants working regularly within the County have not seen such targeted, selective, and retributive code enforcement activity in their 40-year professional capacities.

179.     Dr. and Mrs. Aenlle have taken substantial effort to retain experts but have been unable to obtain assistance because of the County's unreasonable demands. Specifically, consultants have been unable to advise Plaintiff Dr. and Mrs. Aenlle, noting repeatedly the County directives were unreasonable and/or too vague, disabling cogent response.

180.     The county has failed to identify what codes were violated, and significantly, what efforts, if any, the Aenlle family can undertake to "comply" or stop the targeted enforcement.

181.     As part of this targeted harassment campaign, for example, the County has threatened to force Dr. Aenlle to demolish his personal residence because they are unable to find "permits" showing the residence has existed on the property in that location.

182.     The County has personal knowledge this residence has been in this very location for years, despite declaring otherwise. Defendants know there are no "permits" to prove its original existence because it predates this practice.

183.     Dr. Aenlle's wife has provided statements to San Mateo County that many of the contested structures date back to the 1920's-40's, prior to any permitting requirements in the San Mateo area. For example, the Lorder family occupied the disputed residence going back to the 1930's.

184.     Mrs. Aenlle's mother purchased the house from the tenants and herself occupied the "disputed" residence starting 1987.

185.     Legal documents filed with the County demonstrate and officially record this purchase. Taxes have been paid on this improvement and documents recording same are filed with the County assessor's office. Mrs. Aenlle is personally aware that residence was occupied for three generations. Marina has obtained documents from the oldest known person familiar with this property, who has attested to same.

186.     Dr. Aenlle also provided aerial photos of the residence dating to 1965 (because they do not exist dating to 1933), but they were also summarily rejected, without explanation, as "inadequate" proof of existence predating the 2000's. Dr. Aenlle with his wife has occupied the property since the 1990's.

187.     The County has multiple records of the residence in this location, of note and notorious public record. For example, at some point between 1992 and 1994, the County responded to incidents involving a problem tenant of the residence involving shots fired that later led to a conviction. The incident took place in the residence and was investigated and prosecuted by the County.

188.     Starting as early as the 2000's, the county has been on the property to evaluate the septic system, has provided permits, and approved them. This has taken place with respect to the disputed residence, but also the residences of all tenants, which have always been found to have functioning septic systems, compliance with all identifiable county records, and this annual inspection provided ample actual knowledge of the systems and residences relying thereon for decades.

189.     In 2008, Plaintiff received a grading permit, the County came to the property, observed and inspected the residence, and took no action – but certainly identified it was there, contrary to assertions otherwise at this time that they have no knowledge it existed prior to 2010.

190.     The disputed residence has been openly and notoriously visible on the property for nearly one hundred years. Various other disputed structures pre-date permit requirements are/or agricultural buildings and/or and have been notoriously conspicuous, with County endorsement, also for decades.

191.     Dr. Aenlle has attempted to initiate a permit application for an as-built structure as to another structure, but the County has refused to open the permit.

192.     Despite production of this information, the County says that the Aenlle Family has not produced "sufficient" information but also will not advise what would be sufficient information.

193.     Instead of acknowledging these facts, the County arbitrarily and maliciously ignores them and arbitrarily and maliciously demands that Plaintiff comply with regulations applicable to brand new structures that imposes an unnecessary and severe financial burden on Plaintiff's ability to continue to maintain, occupy, or even own the property. This further imposes an unconstitutional condition on the property to simply maintain the property as it has been operated for decades.

194.     Defendants know there are no life safety concerns with the property. This has been verified to the County through Plaintiff's land use consultants working on Plaintiff's behalf. The County makes these assertions now without competent evidence to malign the public and justify their unlawful actions without authority.

195.     The County knows their treatment of Plaintiff is inconsistent with the way they treat other individuals similarly situated.

196.     Plaintiff has attempted to comply with the County's requests for application and ever-shifting requests for documentary production, wishing to work collaboratively with the County in lieu of refusing to "comply." Yet, the County has made it impossible to "disprove" that the structures are illegal because the County requests documents that would not or could not exist because the structures and residences pre-date when any similar documents were directed, required, or maintained by property owners in San Mateo County.

197.     The county has arbitrarily, maliciously, and knowingly refused to acknowledge what it knows to be true, namely: 1) the residences have existed for multiple decades; 2) the structures predate standards applicable to new structures with which the structures were never required to reply. The County has made it impossible to comply with other remediation efforts, where even necessary, for example, by refusing to initiate permit applications and/or explain what steps the County makes up in their standardless definition of compliance and in relation to unstated violates of any law.

198.     The County never objected to any of the uses, conditions, or structures on the property until now. Plaintiff is informed and believes the County has never received any complaints about the conditions on the property, inclusive of from the tenants occupying residences thereon.

199.     Plaintiff is informed and believes that the County has a practice of destroying property records and/or failing to properly retain property records of older entitlements. Plaintiff is informed and believe that Defendants intentionally or recklessly ignore records within County record, or have destroyed or otherwise made them unavailable, in support of their pursuit to deprive Plaintiff of his constitutional rights.

200.     Defendant's actions will not only cause harm as to Plaintiff, but also to their tenants.

201.     The county has continued to arbitrarily and maliciously reject any efforts toward

resolution of the dispute.

202.    For example, the most recent letter obtained on September 3, 2025, continues to decline designation of the applicable statutes or factual explanation of what the violations even are, let alone "how many" there are, while simultaneously threatening readily increasing fines.

203.    The County, through the building department, threatens excessive penalties that Dr. Aenlle cannot afford, or remediate, because no direction is given.

204.    The only way Dr. Aenlle can ascertain to eliminate the County's threat of fines is to destroy his personal residence, which would cause substantial hardship, and eliminate a property right vested and grandfathered on the site. This is true also as to the residences of his tenured tenants, but non-employees or farmworkers, who have lived on the property for four to five decades.

205.    This act would be wholly inconsistent with the harm, if any, the continued existence of the residence(s) creates, which is none. This act would cause irreparable harm to Dr. Aenlle, Mrs. Aenlle, and all their tenants and others occupying the property.

206.    The County has openly advised the public that Dr. Aenlle was a farm labor slumlord, and that Dr. Aenlle had created safety risks for his tenants. The County knew this was not true when they made these comments. In so doing, the County transmitted false and defamatory statements to the public that they knew were untrue with further intent to deprive Dr. Aenlle of his property rights.

207.    The County was aware these facts were untrue because it was provided with competent and substantial evidence, including expert reports, establishing these facts on various occasions. The County knows or should know this is not true because the County knows Plaintiff does not house any farm laborers.

208.    The "process" undertaken to identify these "violations" completely lacked procedural and substantive due process. There was no notice, or hearing. There is no administrator or even administrative process identified to dispute the assessment of violations and fines. There is no opportunity to appeal.

209.    The County determined that Dr. Aenlle's private property was "in violation" without explanation of the standard of review, how liability was determined, and without opportunity for a hearing, cross-examination, or any other due process safeguard prior to assessing penalties.

210.     Dr. Aenlle has repeatedly, but unsuccessfully, tried to convince County staff, and specifically, that their allegations are unfounded and that no violations, or the extent of the alleged violations, do not exist on the property.

211.     The County has been indifferent to Dr. Aenlle (and his wife's) claims and documentary and evidentiary support.

212.     On September 2, 2025, Defendant Monowitz responded to a letter drafted by counsel requesting, in part, identification of the statutory and factual basis for imposition of fines.

213.     Defendant Monowitz did not answer, and instead insisted Plaintiff had not made "meaningful progress on any of the identified abatement actions" and so would recommence "administrative fines in the amount of $500 per day." The statutory basis and factual basis for the fines remained unidentified. Defendant went on to state that "unless we receive the previously identified information and materials," not identified, and still unknown to Plaintiff, "the penalties will increase to a daily fine of $500 per day for each violation." Plaintiff does not know what "each violation" refers to, what statute they relate to, or how to identify how many "violation(s)" Defendants believe exist. Defendant Monowitz refused to provide a "project-by-project" breakdown, identification of "scope of the entire project" or a "collaborative timeline," and failed to substantively respond as to why he refused or could not provide same. (Ex. C: September 3, 2025 Letter from S. Monowitz.)

214.     The code enforcement department operates with unbridled discretion to initiate violations, determine if violations exist, without any oversight or procedural guidelines; in other words, the code enforcement team investigates, evaluates, and determines liability within a singular agent, and without transparent (or any) procedure, in violation of due process.

215.     The code enforcement division operates at Defendant Callagy's direction, and with the express purpose to utilize this evidence to harm Mrs. Aenlle and further retaliate against Dr. Aenlle for his political association and deprive Dr. Aenlle of his employment and property rights.

**J.    The County's Application of Its Unwritten Customs, Policies and Practices.**

216.     The foregoing actions of County officials were taken pursuant to various unwritten interpretations of County Codes, policies and practices promulgated and applied to Plaintiff to prevent Plaintiff from continuing to occupy his property without first making very costly modifications,

demonstration, and/or application to the County that are neither necessary nor legally required and with intent to use these code enforcement actions to take Plaintiff's property without due process of law.

217.    The unwritten interpretations, policies, and practices include: target of Plaintiff without complaint, use of the Farm Labor Task Force, in violation of the Fourth Amendment, and as a pretext to enter Plaintiff's property without probable cause, in support of destabilization of Sheriff Corpus and in retribution for Plaintiff's political association with her, targeting Plaintiff without complaint, life safety concern, or any other stated basis for county conduct, use of the non-public to defame Plaintiff, amongst others.

218.    The County has not and does not apply these interpretations and unwritten customs to the owners and operators of other similarly situated properties.

219.    The constitutional violations described above and further below were enacted at the direction of a final policymaker within the County, formed part of a coordinated policy to oust Sheriff Corpus and Plaintiff, as a critical component of her administration, and/or was part of the formal policy enacted to oust Sheriff Corpus in part by eliminating Sheriff Corpus and her supporters, including Plaintiff. In all instances where the County, a municipality, did not put the acts in to motion, they ratified the unconstitutional decision by subordinates and the basis for it in making the decision to terminate Plaintiff's employment and/or constructively disable his ability to work for the County.

**K. The Consequences of the County's Arbitrary and Malevolent Actions.**

220.    As described above, the County has engaged in a pattern of discriminatory actions against Dr. Aenle motivated by the County's malice and ill will resulting from: 1) support for Sheriff Corpus; 2) attempts to modify the Sheriff Department budget to the detriment of Defendants political supporters, including the beneficiaries of the overtime payments who received nearly 17 million in overtime payments that would be impacted by the department correction; 3) Dr. Aenlle's public speech questioning the motives and actions of the County and staff in removing the Sheriff and Dr. Aenlle's staff position; 4) Dr. Aenlle's public speech questioning the motives and actions in deploying the Task Force, and in particular, in connection with his private residence that did not fall within the stated ambit of the; 5) Dr. Aenlle's public speech relating to filing a claim against the County alleging wrongful termination, 6) the County's desire to punish or "get" Dr. Aenlle, 7) Dr. Aenlle's other past efforts to

thwart and/or discredit the County's efforts to unseat an elected official; and 8) other unknown or arbitrary reasons.

221.    These policies and actions were intended to "get" Dr. Aenlle as punishment for exposing or attempting to expose the County's corruption and pretextual motives for removing Sheriff Corpus, the nepotism involved in county employment and compensation, for Dr. Aenlle's refusal to "play along" with the County corruption, including the code enforcement regime, and for publicly calling our and/or challenging the County's discriminatory conduct in the media, County personnel, amongst others.

222.    These policies and actions reflect a pattern of pretextual regulatory legerdemain intended to: 1) prevent Dr. Aenlle from maintaining his employment with the County; 2) exact punishment for Dr. Aenlle's constitutional exercise of public speech and political association; 3) retaliate against Dr. Aenlle for attempting to disrupt the status quo, 4) to publicly discredit Dr. Aenlle relative to federally protected rights, like his employment; and 5) amongst other things.

223.    The County's actions have damaged Dr. Aenlle. These damages include, but are not limited to: loss of employment, emotional distress, cloud of title on Dr. Anelle's personal property, the cost of attempting to comply with the County's arbitrary and malicious demands, the cost of fines, fees and liens; impairment of personal and professional reputation; mental anguish and suffering; a chill on the rights to free speech and political association and to petition the government; and costs and attorney's fees of this lawsuit and of pursuing various County administrative remedies (which continue to be futile).

224.    All of the County's actions were by County policymakers, at their behest, or because of their deliberate indifference. Their policymakers include, but are not limited to, the County Executive, the Board of Supervisors, the Building and Planning Department, the Code Enforcement Division, the Code Compliance director, the building Department Director.

## V.    CLAIMS

### First Claim

### First Amendment Retaliation (42 U.S.C. § 1983; Cal. Const. Art. I, Section 2(a).)

### Against All Defendants

225.    Plaintiff incorporates and realleges the preceding paragraphs as if fully restated herein.

226.    This action is brought pursuant to 42 U.S.C. sections 1983 and 1988 and seeks equitable relief and damages against the County, and all other Defendants, for violating Plaintiff's First Amendment rights as guaranteed under the First and Fourteenth Amendments to the U.S. Constitution.

227.    Section 1983 claims are not subject to claim procedures: "[T]he California remedy of recourse to the Tort Claims Act need not be first sought before a plaintiff is free to invoke the Civil Rights Act." *Williams v. Horvath* (1976) 16 Cal.3d 834, 842.

228.    Local governmental entities can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where the allegedly unconstitutional action implements or executes a policy statement, ordinance, regulation, or decision officially adopted; or was committed pursuant to a governmental custom. *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112; *see, Monell v. Dep't of Social Serv.* (1978) 436 U.S. 658, 694 [holding that a municipality or local government may be held liable for constitutional violations under 42 U.S.C. § 1983].

229.    42 U.S.C. § 1983 ("Section 1983") further provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." Enforcement of ordinances that are unlawful, void, or against the public welfare are just a few examples of official acts that satisfy the *Monell* requirement.

230.    An individual acting under color of state law is individually liable for federal and state due process violations. *See, e.g.*, *Hafer v. Melo* (1991) 502 U.S. 21.

231.    To state a First Amendment retaliation claim, a plaintiff must show "that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016) (quoting *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006)).

232.    The First Amendment of the United States Constitution provides that "Congress shall make no law … abridging the freedom of speech."

233.    The First Amendment further protects public employees to feely exercise their political beliefs or associations. Political associations are constitutionally protected conduct. Support for a political candidate constitutes protected conduct, and adverse employment actions based on this conduct are a basis for a 1983 claim. *Walton v. New Mexico State Land Office* 49 F.Supp.3d 920 (2014); *Smith v. Da Ros*, 777 F.Supp.2d 340 (2011).

234.    Article 1, Section 2(a) of the California Constitution provides that: "every person may freely speak, write and public his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

235.    The free speech guarantee includes the principle that public employees in non-policymaking roles cannot constitutionally be compelled to relinquish the free speech rights they otherwise enjoy as citizens to comment on matters of public interest.

236.    Plaintiff's support for Sheriff Corpus, and speech relative to Defendant County's corruption, amongst other conduct, constituted protected speech. Plaintiff engaged in protected activity under the First Amendment by Plaintiff's political association and public support for Sheriff Corpus, for exposing the nepotism and improper political underpinnings of compensation in the County, and in publicly commenting on the improper motives underlying the County's removal efforts of the Sheriff (and Plaintiff).

237.    Dr. Aenlle was employed in a non-policymaking role for the County of San Mateo.

238.    Defendants' retaliatory termination for the above acts violates Plaintiff's right to free speech and political association. The activities were the sole, substantial, or motivating cause of the retaliation. The County would not have undertaken its retaliatory actions in the absence of Plaintiff's protected activities. In carrying out the above, Defendants violated the United States and California Constitution.

239.    With respect to termination for Plaintiff's exercise of free speech and political association:

a.    The High court "has rejected for decades now the proposition that a public employee has no right to a government job so cannot complain that that termination violates First Amendment rights…" *O'Hare Truck Serv., Inc. City of Northlake,* 518 U.S. 72, 716 (1996). "It is by now black letter

law that a state cannot condition public employment" on a "basis that infringes on the employee's constitutionally protected interest" like freedom of expression or political allegiance. *Id.* at p. 717.

   b.   An employee demonstrates a First Amendment violation under these patronage cases if a Plaintiff shows they were fired for failing to pledge allegiance to a particular political ideology. *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 69, 74, (1990); see also *Gann v. Cline*, 519 F.3d 1090, 1094 (10th Cir. 2008) (quoting *Bass v. Richards*, 308 F.3d 1081, 1091 (10th Cir. 2002)).

   c.   Inherent in the First Amendment's guarantee is the principle that public employees in non-policymaking roles cannot constitutionally be compelled to relinquish the free speech rights they otherwise enjoy as citizens to comment on matters of public interest.

   d.   Retaliation for exercising protected speech is also a Civil Rights violation. *Pickering v. Board of Education Township High School District 205, Will County, Illinois,* 391 U.S. 563 (1968.)

   240.   Defendants had no legitimate reason for terminating Dr. Aenlle's employment. Even if Defendants identified pretextual reasons for Dr. Aenlle's termination, Plaintiff's termination was substantially motivated by Plaintiff's protected political associations and free speech.

   241.   Dr. Aenlle has suffered harm in the form of lost wages, benefits, other remuneration, and damages resulting from Defendant's termination of his employment.

   242.   By terminating Dr. Aenlle, Defendants have violated, and continue to violate, Dr. Aenlle's rights to free speech guaranteed by the First Amendment to the United States Constitution.

   243.   Defendant's violation of Dr. Aenlle's free speech rights was done with intent, malice and gross and reckless disregard for Dr. Aenlle's constitutional rights.

   244.   Defendants further retaliated against Dr. Aenlle by undertaking arbitrary and capricious code enforcement actions against him. The threat of any other unwelcome, arbitrary, or unjustified law enforcement action, such as Defendants retaliatory code enforcement actions, also constitute unconstitutional retaliation.

   245.   This Ninth Circuit holds that "[o]therwise lawful government action may nonetheless be unlawful if motivated by retaliation for having engaged in activity protected under the First Amendment." *O'Brien*, 818 F.3d at 932. "For example, in *Skoog v. County of Clackamas*, 469 F.3d 1221, 1235 (9th Cir.2006), we held that a plaintiff need not establish the absence of probable cause for

a police officer's seizure of the plaintiff's personal property to make out a First Amendment retaliation claim." *Id.* Put another way, "[a]n act [by the government] taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *Bloch*, 156 F.3d at 681-82 (quoting *DeLoach v. Bevers*, 922 F.2d 618 618, 620 (10th Cir. 1990) and *Matzker v Herr*, 748 F.2d 1142, 1150 (7th Cir. 1983)).

246.    Sheriff Corpus was advised the County would seek retribution as to Dr. Aenlle by "tagging" his personal property and exposing him as a slumlord. Defendant the County in fact took such or similar action. Plaintiff was patently targeted on his personal property for his support for Sheriff Corpus, exposure of department corruption, and refusal to resign to destabilize the Sheriff's Office for the benefit of Defendants Callagy and his supporters

247.    "To demonstrate that retaliation was a substantial or motivating factor behind an adverse … action, a plaintiff can … introduce evidence that the speech and adverse action were proximate in time, such that a jury could infer that the action took place in retaliation for the speech …." *Vargas v. City of Tracy*, 2025 WL 578475, *4 (E.D. Cal. Feb. 21, 2025) (cleaned up).

  a.    The code enforcement actions against Plaintiff took place nearly simultaneous to the unprecedented investigation against him,

  b.    Information about Plaintiff's personal property were used to publicly malign Dr. Aenlle in connection with his professional misconduct.

  c.    The County drew connections, condemning Plaintiff for unlawful farm worker housing (which knowingly does not exist, and is false), and Sheriff's role as first responder to the incident that put the Farm Task force in motion.

  d.    Amongst other acts.

248.    The county took other adverse employment actions against Plaintiff; for example, the County would not indemnify him against lawsuits for actions taken on behalf of the County, in violation of the County's typical practice and state law.

249.    Defendants weaponized code enforcement against Dr. Aenlle's personal property was undertaken in coordination by multiple departments in the County and in connection with other

interrelated actions, including a public media campaign and dissemination to the media to retaliate and punish Dr. Aenlle for exercising his constitutional rights to free speech and political association.

250.    Much of Dr. Aenlle's public speech on matters of public concern was contrary to the political beliefs of Defendants. It is in the public interest to protect citizens from government retaliation when citizens exercise their constitutional rights, and further to protect employees from maintaining free political association and continuing to speak freely on matters of public concern.

251.    Plaintiff's termination caused Plaintiff to suffer actual injury and was designed to chill a person of ordinary firmness from continuing from the targeted political association and/or exercise his right to free speech.

252.    Plaintiff has no adequate remedy of law to secure meaningful relief from the County's retaliation.

253.    Upon information and belief, Defendants, have taken additional retaliatory action against Plaintiff,

**WHEREFORE**, Plaintiff respectfully requests this Honorable Court:

a.   Find that the County, and all Defendants, retaliatory actions violated Plaintiff's First Amendment Rights;

b.   Find that the County is liable for violating Plaintiff's First Amendment Rights;

c.   Invalidate County actions violative of Plaintiff's First Amendment Rights;

d.   Enjoin the County from interfering with Plaintiff's use and maintenance of his property and from requiring Plaintiff to undertaking any of the improvements demanded by the County;

e.   Award Plaintiff actual, compensatory, punitive, nominal and special damages in an amount to be proven at trial, pre-judgment interest, and reasonable attorney's fees and costs against the County for having violated Plaintiff's First Amendment Rights (42 U.S.C. § 1988); and

f.   Grant such other and further relief as this Court deems just and proper.

**Second Claim**

**Violation of (California Labor Code Sections 1101 and 1102)**

**Against all Defendants**

254.    Plaintiff incorporates and realleges the preceding paragraphs as if fully restated herein.

255.    California Labor Code section 1101 provides that "no employer shall make, adopt, or enforce any rule, regulation or policy: a) forbidding or preventing employees from engaging or participating in politics … [or] (b) controlling or directing, or tending to control or direct the political activities of affiliations of employees.

256.    California Labor Code section 1102 provides that "no employer shall coerce or influence or attempt to coerce or influence his employees through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity."

257.    Defendants violated the California Labor Laws when the County threatened to discharge Plaintiff for continuing to politically support Sheriff Corpus and carry out her objectives as an elected official.

258.    Defendants violated the California Labor Laws when the County created a procedure to de-fund Plaintiff's employment because Plaintiff declined to quit and Sheriff Corpus declined to terminate the position.

259.    Defendants retaliated against Plaintiff for blowing the whistle/complaining about/protesting against its unlawful activities, including but not limited to drug use on the job and racial discrimination, which Plaintiff had reasonable cause to believe were violations of the law.

260.    It is a violation of the California whistleblower statute, Cal. Labor Code § 1102.5, and public policy to unlawfully retaliate/punish/discharge or deny opportunities to an employee for refusing to violate the law and/or for protesting unlawful activities to a government agency or his/her employer. Plaintiff protested the unlawful actions, including his reassignment to a lesser position, that were taken against him in response to his reporting illegal conduct.

261.    Plaintiff was a whistleblower pursuant to Cal. Labor Code § 1102.5, as Plaintiff engaged in the following protected activities, among others: informing Defendant of drug use and racial harassment/discrimination on the job by Defendants' employees and supervisors.

262.    However, as a direct result of Plaintiff engaging in legally protected activity and

complaining about and protesting against the aforesaid violations of law (or Plaintiff's reasonable belief that laws were being violated), Defendants retaliated against Plaintiff through the following, among others:

    a. Defendant treated Plaintiff differently, disparately, and negatively because of Plaintiff's whistleblowing by denying Plaintiff opportunities, unfairly disciplining Plaintiff, and refusing/failing to return Plaintiff to Plaintiff's former position or offer Plaintiff employment in any capacity.

    b. Assigning Plaintiff to a position with a heavy commute and half his regular pay. Accordingly, Defendant has maintained a policy and/or practice which prevented/prevents Plaintiff and other employees from complaining about and/or protesting against his employer's violation(s) of law to a government agency and/or person with authority over Plaintiff, or reasonable belief that a law(s) is being violated.

263.    California Labor Code § 1102.5 declares:

    a. An employer, or any person acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance, or from providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

    b. An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the

authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

c.  An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

264.    Defendants violated Cal. Labor Code § 1102.5(b) as they retaliated against Plaintiff for identifying the improper motive for removal of Sheriff Corpus, unlawfully entering his private property for improper motive, and racial harassment/discrimination, which Plaintiff had reasonable cause to believe were violations of the law.

265.    When Plaintiff was subjected to the adverse employment actions identified above, Defendants were substantially motivated by Plaintiff's complaints of violations of state and/or federal law (or Plaintiff reasonable belief that a law(s) was being violated), and said complaints were substantial motivating factors and/or reasons in the decision to subject Plaintiff to the aforesaid retaliatory, adverse employment actions, in violation of California Labor Code § 1102.5.

266.    As a further direct and legal result of the acts of Defendants, Plaintiff has been caused, suffered, and continues to suffer severe and/or permanent emotional and/or mental distress and anguish, humiliation, embarrassment, fright, shock, pain, discomfort and/or anxiety. The exact nature and extent of said injuries is presently unknown to Plaintiff, who will pray leave of court to assert the same when they are ascertained.

267.    Plaintiff is entitled to a civil penalty up to ten thousand dollars ($10,000) for each violation of Cal. Lab. Code § 1102.5.

268.    The aforementioned acts of Defendants were willful, wanton, malicious, intentional, oppressive and despicable and were done in willful and conscious disregard of the rights, welfare and

safety of Plaintiff, and were done by managerial agents and employees of Defendants, and with the express knowledge, consent, and ratification of managerial agents and employees of Defendants, thereby justifying the awarding of punitive and exemplary damages in an amount to be determined at the time of trial pursuant to Cal. Civil Code § 3294(a) and (b).

269.    By the acts and conduct of aforesaid Defendants, Plaintiff has been directly and legally caused to suffer actual damages pursuant to California Civil Code § 3333 including, but not limited to, loss of earnings and future earning capacity, medical and related expenses for care and procedures both now and in the future, attorneys' fees, and other pecuniary loss not presently ascertained, for which Plaintiff will seek leave of court to amend when ascertained.

270.    As a result of the unlawful acts of Defendants, as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of said suit as specifically provided in Cal. C.C.P. § 1021.5. Plaintiff's action enforces important rights affecting the public interest by bringing forth this lawsuit to ensure Defendants refrain from unlawfully retaliating against employees for blowing the whistle, thereby conferring a significant benefit on the general public's health and well-being as a result. The necessity and financial burden of this private enforcement, as well as the interest of justice, entitles Plaintiff to reasonable attorneys' fees and costs under Cal. C.C.P. § 1021.5.

271.    Plaintiff has been damaged in an amount within the jurisdictional limits of this Court.

### Third Claim

### Fourth Amendment Retaliation (42 U.S.C. 1983)

### Against all Defendants

272.    Plaintiff incorporates and realleges the preceding paragraphs as if fully restated herein

273.    The Fourth Amendment protects individuals and entities from unreasonable searches and seizures.

274.    Having the right, privilege and protection of the Fourth Amendment of the United States Constitution to be free of warrantless and/or unreasonable searches, agents of government cannot retaliate against citizens by requiring citizens to submit to a warrantless search under duress, threat, or false pretenses;

275.    Under the guise of the Farm Labor Task Force, Defendants unlawfully entered Plaintiff's property, and that of Plaintiff's tenants, in violation of the Fourth Amendment.

276.    Defendants did not obtain consent from Plaintiff or Plaintiff's tenants to search the tenant's homes.

277.    Defendants lied to the public that all inspections were completed through consent in the Farm Labor Task Program; this is not true.

278.    The Task Force did not inquire whether Plaintiff's tenants were qualifying "farm labor" properties; indeed, Plaintiff's tenants, the Henry Family, have never housed farm laborers. Plaintiff's other tenants, the Contreras family, live on the property with family, not employees.

279.    Both tenants have occupied the property and their residences for decades: the Henry family has lived in their residence since 1977, and the Contreras family since 1980. These structures have never been used for farm labor, or anything other than single family residences. Both tenants did not want to consent to the search but for the Task Force personnel threatened them to force compliance or suffer adverse government action.

280.    Even administrative searches are subject to the Fourth Amendment. That is because "the 'basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.' The officials may be health, fire, or building inspectors." *Michigan v. Tyler*, 436 U.S. 499, 504 (1978) (quoting *Camara v. Municipal Court,* 387 U.S. 523, 528 (1967)).

281.    "Administrative warrant exists if reasonable legislative, administrative, or judicially prescribed standards for conducting an inspection are satisfied with respect to a particular dwelling." *Id.*, n.3 (citations omitted).

282.    Even validly obtained and issued inspection warrants can violate the Fourth Amendment when they are pretextual. "[A]dministrative searches may not be converted into an instrument which serves the very different needs of law enforcement officials. If they could, then all of the protections traditionally afforded against intrusions by the police would evaporate, to be replaced by the much weaker barriers erected between citizens and other government agencies." *See Alexander v. City & Cty. of San Francisco*, 29 F.3d 1355, 1360-61 (9th Cir. 1994).

283.     The Farm Labor Task Force was jointly established by the San Mateo County Planning and Building Department, Environmental Health Services, the County Executive Office (Defendant Callagy).

284.     The Task Force was not empowered or enacted by ordinance or a statutorily designated investigative scope.

285.     The purpose of the Task Force was to "compile a comprehensive list of existing agricultural operations and farmworker housing" because the County records relative to farms and farmworker housing was inadequate (Ex. D: Farm Labor Report).

286.     The "survey process allowed the Task Force to build a current and comprehensive database of active agricultural and ranch operations… regardless of whether they provide employee housing or not." (Ex. D, at Section II "Outreach to Operators and Data Collection," ¶ 3.)

287.     In other words, the Task Force on its face was an unbridled, pretextual method to enter private property without a warrant.

288.     The Task Force's primary purpose for presenting to Dr. Aenlle's property was to gather evidence that could be used against Dr. Aenlle in Defendants' pursuit of removal from County employment, and to gather any other unflattering or useful evidence in their pursuit of character assassination.

289.     While the report of the Task Force operations identified that they conducted inspections of agricultural and ranch operations providing employee housing, the inspections were knowingly not limited to farmworker housing.

290.     Justin Mates, Defendant Callagy's deputy, publicly admitted that the Farm Task force inspections were pretextual, noting his office "authorized [code enforcement officers] to also inspect" anything "they thought" might have "issues."[5] The media could not have obtained those documents but/for release from the County.

291.     This unauthorized and unconstitutional scope was directed by Defendant Callagy.

---

[5] See, e.g., Documents expose deplorable housing conditions, bacteria in water at San Mateo Co. Farms," https://abc7news.com/post/exclusive-san-mateo-county-farms-deplorable-housing-conditions-bacteria-water/15394708/, last visited September 17, 2025.

292.    A statute authorizing an administrative search must do "two things" to provide a constitutionally adequate substitute for a warrant: "[i]t must be 'sufficiently comprehensive' so that businesses are on notice that they will be subject to periodic searches of a properly defined scope" and "[i]t must constrain the discretion of an inspecting officer by being 'carefully limited in time, place, and scope.' " *Liberty Coins, LLC v. Goodman*, 880 F.3d at 286 (6th Cir. 2018) (quoting *Burger*, 482 U.S. at 702).

293.    Here, there was no statute; the search "authority" was untethered to statute, had no identifiable scope or process, and created no guardrails. But, even if it were lawful to administer the Task Force, the actions were not limited in practice or policy. The Task Force knowingly and intentionally exceeded the scope and object of the Task Force, in general and as applied to Dr. Aenlle.

294.    Dr. Aenlle did not have employee-owned workforce housing, so the property did not fall under the ambit of the Task Force in any capacity.

295.    The warrantless property search under the Farm Task Force was pretext and designed to get access to images and information for a civil (and possibly criminal investigation) without securing a warrant as required by the Fourth Amendment.

296.    This pretextual purpose violates the Fourth Amendment: "the government may not use an administrative inspection scheme to search for criminal violations." *New York v. Burger*, 482 U.S. 691, 724 (1987); see also *United States v. Grey*, 959 F.3d 1166, (9th Cir. 2020) Yes, this is precisely what the Farm Task force did: used the Tak Force warrantless inspection scheme to warrantless search for evidence in support of an ongoing civil investigation (and potential new criminal investigation)

297.    Even when searches are discretionary, the "actual motivations of the officer" are relevant, and an administrative search is not justied if merely a "pretext" to mask" an impermissible search. *United States vs. Orozco*, 858 F.3d 1204, 1210, 1213 (9th Cir. 2017.)

298.    The Task Force's inspection of Dr. Aenlle's non-qualifying property revealed the Task Force true purpose – a warrantless property search, inclusive of his home. Even if the task force inspection scheme itself was constitutional, which it is not, use of the scheme to inspect owner residences and areas unrelated to farm labor housing is obviously beyond the scope of the contemplated warrantless farmworker housing inspection.

299.    A complete property search, with building inspectors, code enforcement, and environmental health agents is not part of any normal or routine warrantless inspection scheme authorized under any established exception to the warrant requirement.

300.    While the County may have an interest in "health and safety," the government lacks any identifiable interest in enforcement statutes in a pretextual manner. See, e.g., *Generis Entertainment, LLC v.* Donley, ___ F. Supp.____ 2025 WL 1982872 (6th Cir, July 8, 2025).

301.    The warrantless searches are being used here as "a convenience tool for purely investigative pursuits." (*Id*. at * 9.)

302.    Municipal land use is not a closely regulated "industry."

303.    Dr. Aenlle's tenants allowed and did not attempt to halt the Task Force inspection because they were threatened with adverse consequences for any failure to comply. Dr. Aenlle subsequently asked for statutory authorization for the search but was denied response because there was none.

304.    Dr. Aenlle's refusal to consent to the unlawful search drew retaliation in the form of a targeted code enforcement action unprecedented for similarly situated properties.

305.    The task force did not make inspections pursuant to consent of the property owner, Dr. Aenlle. This is despite representation to the public that inspections were consensual. This statement to the public was knowingly untrue.

306.    The Task Force served as a backdoor to demand access to properties for the purposes of inspecting the property without a warrant, and established an official policy, custom, and/or practice that is contrary to rights, privileges and protections of the Fourth Amendment of the United States Constitution, and in so doing, violated same. This is true generally, and as applied.

307.    Because of the violations of the Fourth Amendment, Dr. Aenlle suffers from an imminent and credible threat of injury of government punishment in an administrative agency action despite that very tribunal lacking any authority or jurisdiction to decide any issues of constitutionality. *Universal Am-Can, Ltd. V. Attorney General* 494 N.W.2d 787, 791 (Mich. Ct. App. 1992).

308.    Because of the violations of the Fourth Amendment, Dr. Aenlle suffers from an imminent and credible threat of injury of government punishment through retaliatory code enforcement actions of undefined scope as to his property.

309.    Because of the violations of the Fourth Amendment, Dr. Aenlle suffers from an imminent and credible threat of injury of government punishment through termination of his government employment and prohibition and/or frustration of his ability to seek future employment.

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief

    a.  Find that the evidence obtained related to Plaintiff's property violated the Fourth Amendment;

    b.  Enjoin the County from assessing fines against Plaintiff's property, using any evidence obtained unconstitutionally against Plaintiff in any actions, and from requiring Plaintiff to make any of the as yet unidentified "improvements" or "modifications" demanded by the County;

    c.  Award Plaintiff damages, pre-judgment interest, and reasonable attorneys' fees and costs against the County for having violated the Plaintiff's equal protection rights;

    d.  Grant such other and further relief that this Court determines to be equitable, just, proper, or necessary under the circumstances.

### Fourth Claim

### Violation of Procedural Due Process Rights (42 U.S.C. 1983)

### Against all Defendants

310.    Plaintiff incorporates and realleges the preceding paragraphs as if fully restated herein.

311.    This action is brought under 42 U.S.C. §§ 1983 and 1988 for equitable relief and damages against the County and other Defendants for violations of Plaintiff's due process rights under the First and Fourteenth Amendments.

312.    The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution provides that no state may "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1.

313.    The Fourteenth Amendment has been construed to provide rights to procedural due process.

314.    Similarly, the California Constitution also provides that "[a] person may not be deprived of life, liberty, or property of due process of law." (Cal. Const. Art. 1, § 7.)

315.    Plaintiff holds property rights and liberty interests in his real property, employment, and future employment. These interests are protected even for at-will employees. *See Hyland v. Wonder*, 971 F.2d 1129, 1141 (9th Cir. 1992); *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971).

316.    Constitutional due process demands "the opportunity to be heard at a meaningful time in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 391, 333 (1976).

317.    Defendants violated Dr. Aenlle's constitutional rights to due process in relation this his employment, and ability to obtain future employment, amongst other acts, as follows:

       a. Using the "Cordell Report" as a pretext to terminate and discredit him;

       b. Employing a non-statutory process lacking due process safeguards and authority;

       c. Failing to provide notice or a meaningful opportunity to be heard;

       d. Denying a neutral factfinder;

       e. Withholding witness identities and denying cross-examination;

       f. Refusing consideration of rebuttal evidence;

       g. Citing policies that were undefined, nonexistent, or fabricated; and

       h. Proceeding without any known or authorized procedure.

318.    The County did not give Plaintiff an opportunity and a hearing to clear his name prior to or after constructively terminating his employment with the County and denying him the ability to take other positions within the Sheriff's Office. *See, e.g., Bellows v. Federal Reserve Bank*, 650 F.2d 1093, 1100 (9th Cir. 1981).

319.    The code enforcement action taken against Plaintiff does not provide adequate notice, provide any ability to contest or dispute the allegations, were assessed through unspecified procedure, and did not provide for adequate notice or a meaningful opportunity to be heard before deprivation of rights:

       a.   Entering Plaintiff's property without a warrant in violation of the Fourth Amendment;

b.   Failing to establish the constitutionality of evidence used against him;

c.   Exercising unchecked discretion to investigate, adjudicate, and penalize without oversight or neutral arbiters;

d.   Acting arbitrarily and capriciously without standards;

e.   Providing no opportunity to contest or cross-examine evidence;

f.   Concentrating investigative and adjudicative functions in a single agent;

g.   Shifting the burden of proof to Plaintiff to disprove unspecified violations;

h.   Failing to give adequate notice or hearings;

i.   Destroying or negligently maintaining records, impairing Plaintiff's defense;

j.   Imposing or threatening fines without notice, hearing, or appeal; and

k.   Other unconstitutional practices.

320.    The above procedural deficiencies, individually and cumulatively, violated Defendants rights to due process before assessment of liabilities and penalties as to his property.

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief

a.   Find that the County's termination of Dr. Aenlle violated his due process rights;

b.   Find that the County's use of false evidence violated Plaintiff's due process rights;

c.   Find and Declare that the County's Cordell Report violated Plaintiff's due process rights;

d.   Find that the County's code enforcement activity directed toward Plaintiff's property violate his due process rights;

e.   Invalidate the County's interpretations of its Code and its unwritten policies and practices that prevent Plaintiff from continuing to maintain and occupy the structures on their private property without further application to the County;

f.   Enjoin the County from assessing fines against Plaintiff's property and from requiring Plaintiff to make any of the as yet unidentified "improvements" or "modifications" demanded by the County;

g. Enjoin the County from continuing to communicate that there are violations at the property where such violations have never been substantiated by a competent judicial tribunal;

h. Award Plaintiff damages, pre-judgment interest, and reasonable attorneys' fees and costs against the County for having violated the Plaintiff's equal protection rights;

i. Grant such other and further relief that this Court determines to be equitable, just, proper, or necessary under the circumstances.

**Fifth Claim**

**Violation of Substantive Due Process Rights (42 U.S.C. 1983 and California Constitution)**

**Against all Defendants**

321.    Plaintiff incorporates and reallegse the preceding paragraphs as if fully restated herein.

322.    The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution provides that no state may "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1.

323.    Article 1, Section 7 of the California Constitution similarly provides that "a person may not be deprived of life, liberty, or property without due process of law…"

324.    Defendants, acting under color of state law, have violated and continue to violate Dr. Aenlle's right to substantive due process guaranteed under the Fourteenth Amendment to the United States Constitution.

325.    Plaintiff has a constitutionally protected liberty and property interest in employment, future employment, and use of property, amongst others.

326.    Defendants, acting irrationally and arbitrarily, deprived Plaintiff of these protected interests without providing constitutional adequate notice, a fair hearing, or other procedures required by due process.

327.    The Due Process Clause demands that before an individual is denied the right to engage in the common occupations of law, he must be afforded due process of law in terminating that right. A liberty interest is also at stake if the government takes steps that so "severely stigmatize the employee that [he[ cannot available [himself] of other employment opportunities" in the future. *See, e.g., Hyland*

*v. Wonder* 971 F.2d 1141 (9th Cir. 1992). In instances "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."

328.    San Mateo County enforces arbitrary and vague laws against Marina Aenlle and Dr. Aenlle which interfere with Plaintiff's right to make lawful use of their property.

329.    Further, "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

330.    The vagueness doctrine reflects two interrelated requirements. First, laws must give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id*. Second, the vagueness doctrine demands that laws "provide explicit standards for those who apply them to avoid "arbitrary and discriminatory enforcement." *Id.*

331.    As discussed above, San Mateo County refuses to identify what codes Plaintiff violated, or otherwise identify legal authority for the property allegations at issue in the code enforcement action.

332.    San Mateo County has utilized this vagueness to implement various interpretations of the law, written and unwritten.

333.    San Mateo County applies its laws in an arbitrary and capricious manner specifically designed to violate Plaintiff's due process rights.

334.    The San Mateo County Code fails to provide explicit standards for those who apply them which then allows San Mateo County officials to engage in arbitrary and discriminatory enforcement.

335.    Plaintiff cannot identify what conduct is permitted due to inconsistent enforcement for the same conduct and as to similarly situated properties.

336.    The Code enforcement efforts lack constitutional notice…

337.    The Fourteenth Amendment has been construed to provide rights to substantive due process, in addition to procedural due process.

338.    Similarly, the California Constitution also provides that "[a] person may not be deprived of life, liberty, or property of due process of law." (Cal. Const. Art. 1, § 7.)

339.    A plaintiff has a liberty interest against defamatory state action "if the charge [brought by the state] impairs a reputation for honestly or morality." *Matthews v. Harney Cnty.*, 819 F.2d 889, 892 (9th Cir. 1987). Such liberty claims are actionable under § 1983 via procedural due process claim if the plaintiff was subjected to "stigma plus," for example, "if the state makes a charge against a plaintiff that might seriously damage his standing and associations in the community…" *Wenger v. Monroe*, 282 F.3d 1068, 1074 (9th Cir. 2002).

340.    "To violate substantive due process, the alleged conduct must 'shock[] the conscience and 'offend the community's sense of fair play and decency.'" *Marsh v. Cnty. Of San Diego*, 680 F.3d 1148, 1154 (9th Cir. 2012).

341.    Defendants have publicly and repeatedly accused Dr. Aenlle of maintain an amorous relationship with Sheriff Corpus, of lacking credibility, of maintaining slum tenancies, and professional incompetence, all of which were knowingly untrue.

342.    Defendants' creation and endorsement of an taxpayer-sanctioned witch hunt for the unique and unprecedented purpose of putting a public and professional smear campaign into motion was without authorization and lacked even minimum due process.

343.    The "process" was designed with the intent to deny Dr. Aenlle notice, an opportunity to create a full and fair evidentiary record, and a meaningful opportunity to defend his employment.

344.    Defendants' legal representation of constituent parts of a public and department entities with clearly adverse interests and declining to declare a conflict or provide for representation of the individual departments and representatives, including Dr. Aenlle.

345.    The County's interpretation of its code and the unwritten policies and practices promulgated and applied by County officials with respect to Dr. Aenlle's property and demanding reviews, reports, modifications and/or applications that are neither necessary nor legally required are arbitrary, capricious and unreasonable and motivated by ill will and malice toward Plaintiff.

346.    These policies, interpretations and practices violate Plaintiff's right to due process of law, for which the County is liable.

347.    Constitutional due process prohibits the government's intentional use of false evidence in support of the deprivation of constitutional rights. (*Kerkeles v. City of San Jose* (2011) 199 Cal.App.4th 1001, 1010-1011; *People v. Charles* (2015) 61 Cal.4th 308, 328.)

348.    A substantive due process injury results in use of false evidence to induce legal action whether adverse consequences result *or not*. The government violates due process through any intentional use of false evidence. See, e.g., *Kerkeles v. City of San Jose* (2011) 199 Cal.App.4th 1001, 1010-1011.

349.    A government lawyer is has the responsibility to seek justice and develop and fll and fair record, and he should not use his position or the economic power of the government to harass parties or to bring unjust settlements or results. *People ex rel Clancy v. Superior Court* 39 Cal.3d at 746.)

350.    The government is also under an independent obligation to disclose any evidence material to guilt or innocence. See, e,g, *Kashem v Barr*, 941 F.3d 358, 386-387 (9th Cir. 2019), citing *Brady v. Maryland* (1963) 373 U.S. 83.

351.    A government prosecutor further has certain ethical obligations when it comes to discovery that exist *in addition to* any constitutional (i.e., *Brady*) or statutory discovery obligations. See, also, Rule 3.8, Special Responsibilities of a Prosecutor, requires prosecutors to timely disclose all evidence or information that tends to negate the guilt of the accused, mitigate the offense, or mitigate the sentence. Rule 3.8 applies to County Counsel in civil actions. (*People ex rel. Clancy v. Superior Court* (1985) 39 Cal.3d 740, 747.)

352.    A government lawyer in a civil action or administrative proceeding has the common law and professional obligation "to seek justice," "develop a full and fair record," and avoid conduct that brings about "unjust settlements or results" or seek to "use the power of the government to harass parties." (*People ex rel. Clancy v. Superior Court* (1985) 39 Cal.3d 740, 747.)

353.    The "prosecution team" includes agencies acting on the government's behalf, inclusive of a planning department and/or Board of Supervisors, in this case. *Strickler v. Greene* (1999) 527 U.S. 263, 281.

354.     Defendants knowingly sought Dr. Aenlle's termination based on false evidence and in so doing, violated Plaintiff's right to due process, for which the County is liable.

355.     Defendant knowingly utilized false evidence in a hearing (underlying the Cordell and Keker Reports) with the intent to terminate Dr. Aenlle's employment. In fact, Dr. Aenlle *was* terminated the day after release of the Cordell report, and thus, based on false evidenced proposed, endorsed, and never corrected by the County. In so doing, Defendants violated Plaintiff's right to do process.

356.     Defendants knowingly withheld exculpatory sections of the transcript from Dr. Aenlle's transcript ultimately released to the public.

357.     As set forth above, in their zeal to remove Sheriff Corpus, and co-extensively her loyal support team, including Dr. Aenlle, Defendants have ….

358.     Under the California Constitution, "due process safeguards" hold "that *freedom* from arbitrary adjudicative procedures is a substantive element of one's liberty." (Emphasis added.) *People v. Ramirez,* 25 Cal.3d 260, 268-69 (1979).

359.     The Board lacked authority to de-fund Plaintiff's position:

a.    When a California county adopts a charter, its provisions are the law of the State and have the force and effect of legislative enactments. Under the 'home rule' doctrine, county charter provisions concerning the operation of the county, and specifically including the county's right to provide for the number, compensation, tenure, and appointment of employees trump conflicting state laws. The County has plenary authority to determine who is a civil servant and who is not, as terms of civil service employment are governed by county charter.

b.    Section 4 of article XI of the California Constitution sets forth the areas that the charter county "shall provide for." Included therein are: "The fixing and regulation by governing bodies, by ordinance, of the appointment and number of assistants, deputies, clerks, attaches, and other persons to be employed, and for the prescribing and regulating by such bodies of the powers, duties, qualifications, and compensation of

such persons, the times at which, and terms for which they shall be appointed, and the manner of their appointment and removal."

c.   Though the Board supervises the official conduct of the Sheriff and has power under the Charter to prescribe the manner of appointment and removal of employees, the Board cannot interfere with the independent and constitutionally and statutorily designated investigative functions of the Sheriff. The Board has no power to perform the Sheriff's statutory duties for her and has no control, either directly or indirectly, over the manner in which those duties are performed.

d.   The Sheriff is an elected official, who acts on behalf of both the State of California and the Sheriff's County in executing her duties. The Sheriff, therefore, is a constitutional officer, and her duties are of statewide importance. The Sheriff is functionally independent from control by the Board in performing her law enforcement functions.

e.   Only the Sheriff has control of and responsibility for distribution and training of personnel, and the Board has no authority to control employment in or operation of the Sheriff's office.

f.   The power and duty to enact a county's budget is vested by law in the Board by the California Government Code. The Board's role in the budget process is complete upon adoption of the budget. The Board's control does not encompass the management of budgetary allotments made to the Sheriff's Office the responsibility for which is conferred solely upon the Sheriff. Only the Sheriff has control of the specific use of the funds allotted to her.

g.   The Board's control over the Sheriff's personnel ends with allocation of funds and number of employees/number of positions. The Board does not have the authority to make specific decisions regarding personnel deployment within the Sheriff's Office. Only the Sheriff has control over specific personnel assignments within the Sheriff's Office.

h.   The San Mateo County Charter ("Charter") specifically vests the Sheriff, who is a Department Head, with the authority to appoint, supervise, suspend and remove all

persons employed in her department. In that same vein, the San Mateo County Code provides that the duties of department heads shall include the appointment of heads of divisions and other principal administrative staff. Finally, pursuant to the San Mateo County Sheriff's Office Policy Manual ("Policy Manual"), the Sheriff is the chief executive officer of the Sheriff's Office and the final authority of all matters of policy, operations and discipline.

i.  Contrary to these limitations on the Board's authority, the Board took action that directly interferes with the Sheriff's management of her Office and her personnel assignments by deleting a position within her executive staff, not as a legitimate budgetary action, but rather with the sole end of terminating the specific employee holding that position from County employment.

j.  In July of 2023, the San Mateo Human Resources Department created the position classification of B421 Sheriff's Executive Director of Administration - Unclassified. Prior to that time, this classification did not exist within the County. The Sheriff was authorized three (3) B245 Assistant Sheriff – Unclassified positions in the fiscal years of 2017-2018, 2018-2019, 2019-2020, 2020-2021, 2021-2022, 2022-2023, and 2023-2024.

k.  The Sheriff appointed Plaintiff to the position of Executive Director of Administration. The B421 Sheriff's Executive Director of Administration – Unclassified position filled one of the three (3) B245 Assistant Sheriff – Unclassified positions.

l.  On November 13, 2024, the Board took action abolishing the position classification of B421 Sheriff's Executive Director of Administration – Unclassified. The Board also authorized an amendment to the Master Salary Resolution 080517 to remove the salary set forth for the classification. This was to expand the scope of the action to eliminate Plaintiff position knowing the Sheriff intended to re-assign Dr. Aenlle to a different position in the event the board eliminated his position (which they did).

m.  In abolishing the position classification of B421 Sheriff's Executive Director of Administration – Unclassified and effectively, one of the B245 Assistant Sheriff –

Unclassified positions, the Board made no determination such action was fiscally necessary nor did the Board determine that that operational needs of the Department no longer required the deleted position. This is evidenced, amongst other things, by the fact that Defendant Board gave itself a raise during the same meeting.

n.  Indeed, the Board's action was not motivated by fiscal concerns at all, but rather by political concerns. The Board has made it very clear that it was targeting a specific employee – Victor Aenlle (Plaintiff) – in deleting the B421 position classification.

o.  Though the Board can eliminate positions within the Sheriff's Office, it has no authority to remove specific individuals or remove unclassified positions, which are characterized as the Sheriff's cabinet or personal administrative staff. It is wholly within the Sheriff's prerogative to otherwise assign an employee whose position has been eliminated and appoint and terminate unclassified positions.

p.  The Board set out to terminate Dr. Aenlle specifically, beyond the authority of Defendant Board. This was evidenced by their intent to end-run the Sheriff's change in title for Dr. Aenlle.

q.  This action by the Board with respect to the deletion of the B421 position is in excess of its authority, violates the State Constitution, case law, statutory law, the County Charter and County Ordinances and Policies all of which confer independent authority to the Sheriff as to her personnel assignments.

360.  The removal of Dr. Aenlle by Defendants was unauthorized. By circumventing the charter and developing a process to eliminate him by terminating him through defunding the position and department, an authorization that rests exclusively with the Sheriff who did not carry it out, constitutes an arbitrary and capricious act, ultra vires, and an abuse of discretion, in violation of Dr. Aenlle's substantive due process rights.

361.  The arbitrary and capricious code enforcement actions.

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief:

a.  Find that the County's termination of Dr. Aenlle violated his due process rights;

b.  Find that the County's use of false evidence violated Plaintiff's due process rights;

c.   Find and Declare that the County's Cordell Report violated Plaintiff's due process rights;

d.   Find that the County's code enforcement activity directed toward Plaintiff's property violate his due process rights;

e.   Invalidate the County's interpretations of its Code and its unwritten policies and practices that prevent Plaintiff from continuing to maintain and occupy the structures on their private property without further application to the County;

f.   Enjoin the County from assessing fines against Plaintiff's property and from requiring Plaintiff to make any of the as yet unidentified "improvements" or "modifications" demanded by the County;

g.   Enjoin the County from continuing to communicate that there are violations at the property where such violations have never been substantiated by a competent judicial tribunal;

h.   Award Plaintiff damages, pre-judgment interest, and reasonable attorneys' fees and costs against the County for having violated the Plaintiff's equal protection rights;

i.   Grant such other and further relief that this Court determines to be equitable, just, proper, or necessary under the circumstances.

**Sixth Claim**

**Equal Protection - Selective Enforcement (42 U.S.C. 1983 and California Constitution)**

**Against All Defendants**

362.   Plaintiff incorporates and realleges the preceding paragraphs as if fully restated herein.

363.   At all times, Defendants acted under color of state law.

364.   This action is brought pursuant to 42 U.S.C. sections 1983 and 1988 and seeks equitable relief and damages against the County for violating Dr. Aenlle's right to equal protection of law guaranteed under the Fifth and Fourteenth Amendments to the U.S. Constitution. The Equal Protection Clause of the Fourteenth Amendment prohibits state actors form treating similarly situated individuals different without rational basis, or for impermissible or retaliatory reasons.

365. The County has arbitrarily and maliciously applied and enforced its code, unwritten customs, policies and practices unequally to discriminate against Plaintiff without natural basis.

366. The County's actions violate Plaintiff's rights to equal protection of the law for which the County is liable.

367. The California Constitution similarly prohibits disparate enforcement of the law against Plaintiff, while declining to enforce the same provisions against similarly situated property owners, constitutes intentional and unlawful discrimination in violation of Article I, Section 7 of the California Constitution.

368. Defendants intentionally treated Plaintiff differently that similarly situated properties, and there is no rational basis for the disparate treatment.

369. Defendants' selective enforcement was motivated by the invidious or impermissible considerations, including retaliation against Plaintiff for protected speech or political association, hostility toward Plaintiff personally, and/or arbitrary animus.

370. The County also enforced the law against Plaintiff, but not against others similarly situated, by doing the following, amongst other things:

    a. Plaintiff is informed and believes that no other property owner has been "investigated" for grandfathered structures in similar ways, under similar conditions;

    b. Plaintiff is informed and believes the County did not prosecute the prior property owner for the same objectionable conduct, but is pursuing investigations and/or against Plaintiff, either because the claim is fabricated, or because of unique animus to Plaintiff;

    c. Plaintiff is informed and believes the County does not require what they are asking of Plaintiff for other existing properties in alleged remediation,

    d. Defendant Steven Monowitz and Tim Sullivan were directed by Defendant Callagy to pursue any code enforcement claim possible against Plaintiff to lend support to the ongoing public character assassination of Sheriff Corpus and Dr. Aenlle, as Chief of Staff;

e.  The County has not required other owners of pre-existing residences to obtain new permits to continue to maintain and occupy them as they have been maintained and occupied for decades;

f.  The County does not deem other grandfathered or historic structures to be subject to regulations that post-date those structures nor has the County required owners and operators of other similarly situated properties to make the same improvements they now demand of Plaintiff. Rather, the County has permitted such similarly situated structures to remain without any application until changes are requested or an actual safety incident occurs;

g.  Defendants' acts were arbitrary, capricious and an abuse of power because untethered to any law prohibiting and/or regulating the conduct;

371.  Plaintiff is being irreparably harmed by the County's unequal treatment and discriminatory application of its Code and unwritten customs, policies and practices.

372.  It is in the public interest to protect property owners and ensure that citizens are afforded the right to exercise their constitutional rights without government retaliation against their property.

373.  Plaintiff has no adequate remedy at law to secure meaningful prospective relief from the County's unequal and discriminatory application and enforcement of its code and unwritten customs.

374.  Defendants' selective enforcement was motivated by Dr. Aenlle's political support for Sheriff Corpus, his public speech, and animus unique to him.

375.  Defendants' conduct violated Platiniff's right to equal protection guaranteed by the Fourteenth Amendment.

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief:

a.  Find that the County's unequal and discriminatory application and enforcement of its Code and its unwritten policies violated Plaintiff's equal protection rights;

b.  Find that the city is liable for violating Plaintiff's equal protection rights;

c.  Invalidate the County's interpretations of its Code and its unwritten policies and practices that prevent Plaintiff from continuing to maintain and occupy the structures on their private property without further application to the County;

d.  Enjoin the County from assessing fines against Plaintiff's property and from requiring Plaintiff to make any of the as yet unidentified "improvements" or "modifications" demanded by the County;

e.  Enjoin the County from continuing to communicate that there are violations at the property where such violations have never been substantiated by a competent judicial tribunal;

f.  Award Plaintiff damages, pre-judgment interest, and reasonable attorneys' fees and costs against the County for having violated the Plaintiff's equal protection rights;

g.  Grant such other and further relief that this Court determines to be equitable, just, proper, or necessary under the circumstances.

**Seventh Claim**

**Wrongful Termination in Violation of Public Policy**

**Against Defendant County and Defendant Board**

376.  Plaintiff incorporates and realleges the preceding paragraphs as if fully restated herein.

377.  This court has jurisdiction over this claim pursuant to the supplemental jurisdiction conveyed to this court pursuant to 28 U.S.C. 1367.

378.  The common law tort of wrongful termination in violation of public policy holds that termination of employment, even of an at will employee, is not immunized from liability the discharge violates fundamental principles of public policy. (See, e.g., *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 889-890.)

379.  Plaintiff was employed by Defendant County and was terminated on November 13, 2024.

380.  Defendants' terminated Plaintiff.

381.  This act was ultra vires, as Defendants did not have the authority to terminate Dr. Aenlle.

382.    Plaintiff was terminated for the following unlawful reasons, amongst others:

a.  Due to Plaintiff's support and political association with Sheriff Corpus

b.  Based on knowingly false facts and without due process of law.

c.  To destabilize Sheriff Corpus' leadership team and in turn, her ability to lead and run her department,

d.  In violation of California law, for ultra vires acts of interference in the Sheriff's Office's Administration.

e.  To intimidate Sheriff Corpus, which violates California law;

f.   For Plaintiff's protected speech identifying the County's improper conduct in connection with Sheriff Corpus' removal and/or identifying political corruption in the office;

g.  By falsifying basis for termination, like impersonation of an officer, that were knowingly false, and demonstrably untrue.

383.    The termination for the above reasons, independently and cumulatively, contravene fundamental public policy and/or violate the law.

384.    It is in the public's interest to exercise the First Amendment rights to political association and exercise of free speech.

385.    Plaintiff was harmed by the termination in violation of public policy, and the discharge was a substantial factor in causing Plaintiff that harm.

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief:

a.  Find that the County's termination of Plaintiff violated public policy;

b.  Find that the city is liable for terminating Plaintiff's in contravention of public policy;

c.  Award Plaintiff damages, pre-judgment interest, and reasonable attorneys' fees and costs against the County for having violated the Plaintiff's equal protection rights;

d.  Grant such other and further relief that this Court determines to be equitable, just, proper, or necessary under the circumstances.

**Eighth Claim**

**Violation of Civil Rights – Defamation Plus – 42 U.S.C. 1983**

**Against all Defendants**

386.    Plaintiff incorporates and realleges the preceding paragraphs as if fully restated herein. At all times Defendants operated under the color of law.

387.    Plaintiff states a cognizable §1983 claim for defamation when the injury to reputation was inflicted in connection with a federally protected right or the injury caused the denial of a federally protected right.

388.    Plaintiff engaged in constitutionally protected activity, including political association with Sheriff Corpus, protected speech, whistleblowing, and various other acts, protected by the First Amendment.

389.    Plaintiff engaged in constitutionally protected activity, including the right to be free from unreasonable and unlawful government intrusion and interference with his personal property.

390.    Defendants, acting under color of law, made false statements about Plaintiff to third parties, including the media, coworkers, public agencies, and through public hearings, asserting that Plaintiff was unfit for employment, was carrying on an affair with Sheriff Corpus, was engaged in misconduct, was impersonating a police officer, and was dangerous, amongst others.

391.    Defendants made defamatory comments in connection with Plaintiff's government employment and professional capabilities which were knowingly false and did in fact cause his employment to terminate based on these knowingly false statements. The statements about Plaintiff's property to the public were knowingly and demonstrably false.

392.    A plaintiff has a liberty interest against defamatory state action, that is, "if the charge [brought by the state] impairs a reputation for honesty or morality." *Matthews* v. *Harney Cnty.*, 819 F.2d 889, 892 (9th Cir. 1987). Such liberty claims are actionable under § 1983 via a procedural due process claim if the plaintiff was subjected to "stigma plus," *i.e.*, "if the state makes a charge against a plaintiff that might seriously damage his standing and associations in the community…." *Wenger* v. *Monroe*, 282 F.3d 1068, 1074 (9th Cir. 2002).

393.    The defamation in fact caused Plaintiff to lose his government employment.

394.    The defamation further deprived Plaintiff of future employment, for example, anticipated future employment designated by the Sheriff.

395.    Defendants wrongfully searched Plaintiff property without probable cause and after the search, publicly broadcasted statements that damaged Plaintiff's republication.

396.    Defendants used false information to initiate code enforcement actions that did in turn deprive

397.    The defamation in fact caused suspension of Plaintiff's Fourth Amendment rights.

398.    These statements further created disharmony with others in the Sheriff's Office, inclusive of his reports and co-workers, which disabled his ability to complete his core professional functions.

399.    These statements were made without basis or without any reference to qualifications for the position that was, in fact, created specifically for Dr. Aenlle. The dissemination of these misrepresentations was knowingly false, and to discredit Dr. Aenlle in his professional community, disable him from doing his job, and foreclose him from seeking further employment in this capacity.

400.    Defendants made false statements of fact communicating to the Public that Plaintiff was not a sworn police officer, and was not allowed to enter public buildings, a right granted through to him through his sworn officer status and government employment.

401.    Defendants made defamatory comments in connection with the searches of Plaintiff's property for which there was no probable cause. (*Herb Hallman Chevrolet Inc. v. Nash Holmes*, (169 F.3d 636, 645 (9th Cir. 1999); *Jensen v.* Stangel, 762 F.2d 815, 818 (9th Cir. 1985).

402.    Where the statements were based on opinions derivative of "investigative" reports, the declarants and disseminators knew or should have known that the statements were made on incorrect or incomplete.

403.    The statements and/or publications were disseminated and/or uttered as though they were Official statements of Defendant County and with the intent to diminish public confidence in Plaintiff in his employment, as well as personal and professional capacity for credibility.

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief:

a.  Find that the County's actions unlawfully deprived Plaintiff of rights guaranteed by the federal and state constitutions, as to his employment and property;

b.  Award Plaintiff damages, pre-judgment interest, and reasonable attorneys' fees and costs against the County for having violated the Plaintiff's rights;

c.  Grant such other and further relief that this Court determines to be equitable, just, proper, or necessary under the circumstances.

**Ninth Claim**

**Defamation– California Civil Code §§ 44, 46**

**Against all Defendants**

404.  Plaintiff incorporates and realleges the preceding paragraphs as if fully restated herein.

405.  Defendants did slander Defendant in disseminating false and unprivileged publications, and oral communications, that directly injured Plaintiff in respect to his office, profession, trade or business, either by imputing to him general disqualification, and by imputing something with reference to his office, profession, trade or business that has a natural tendency to injure or cause special damage.

406.  Defendants did slander Defendant in disseminating false and unprivileged publications, and oral communications, that directly injured Plaintiff in respect to his fidelity and "want of chastity."

407.  Defendants did slander Defendant in disseminating false and unprivileged publications, and oral communications, that directly injured Plaintiff by averring that Plaintiff violated the law by impersonating an officer and Plaintiff was punished for this conduct in loss of his job.

408.  Defendants did slander Defendant in disseminating false and unprivileged publications and oral communications, that directly injured Plaintiff in alleging Plaintiff was a dangerous man (or intended specifically to give that impression, to the public and co-workers).

409.  The above writings and oral dissemination were not opinion, but rather statements of false fact.

410.  Where the statements were based on opinions derivative of "investigative" reports, the declarants and disseminators knew or should have known that the statements were made on incorrect or incomplete facts and disseminated the false assertions of fact notwithstanding.

411.    The statements and/or publications were disseminated and/or uttered as though they were official government statements related to Plaintiff's employment with the government or with the intent to deprive Plaintiff with his role within the government.

412.    All of the above cause natural damage as thus were defamation per se. There is no proof of actual damages required. *Regalia v. Nethercutt Collection*, 172 Cal. App. 4th 361, 367 (2009); *Crowe v. Cnty of San Diego,* 608 F.3d 406, 442 (9th Cir. 2010).

413.    However, all of the above statements did cause actual damages, including lost employment, lost income, official votes of no confidence from work colleagues, fear of Plaintiff disabling work function, and end of government career, amongst other things.

414.    These statements were made with the intention to cause harm to Plaintiff and end Plaintiff's employment, end his career, destabilize the Sheriff's Office administration, and disrupt Plaintiff's personal and professional life to further Defendants ulterior motives.

415.    These disseminations, and in particular in light of the failure to correct, constituted defamation per se.

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief:

    a.    Find that the County's actions unlawfully disclosed private facts causing harm;

    b.    Award Plaintiff damages, pre-judgment interest, and reasonable attorneys' fees and costs against the County for having violated the Plaintiff's rights;

    c.    Grant such other and further relief that this Court determines to be equitable, just, proper, or necessary under the circumstances.

### Tenth Claim

### Public Disclosure of Private Facts – California Common Law

### Against all Defendants

416.    Plaintiff incorporates and realleges the preceding paragraphs as if fully restated herein. Defendants caused confidential and personal material relating to Plaintiff to be distributed to the media and members of the public to inform, incite and facilitate a public smear campaign relative to Plaintiff public and professional credibility and related to his employment with the San Mateo County Sheriff's Office.

417.    To the extent that true information was published in connection with the defamatory statements, it should not have been disclosed as matters of employee privacy.

418.    On information and belief, Defendants, while acting in their official roles, intentionally caused this information to be released to the public.

419.    The private and confidential matters were not matters of public concern or related to Plaintiff's actual job performance but were released to engender ill will in plaintiff's official capacity and malign plaintiff.

420.    On information and belief, and as County employees, Defendants knew or should have known that personnel information is held in the strictest confidentiality and that therefore the public dissemination violated internal policies, and Plaintiff right to privacy, and was averse to the interest of Plaintiff (and the Sheriff's Office).

421.    On information and belief, Defendants made similar intentional disclosures of privileged investigative materials about Dr. Aenlle's property, Dr. Aenlle's government tort claims, and materials in Dr. Aenlle's employment file.

422.    The reports were highly offensive to a reasonable person, and not of legitimate concern.

423.    Due to the public disclosure of confidential information, Plaintiff has been subject to significant public scrutiny. Numerous newspaper articles, TV news items, and news blogs report on Plaintiff regularly and the publicity surrounding this information has publicly lingered and recurred for months. The information has reached an untold thousands of news consumers.

424.    Plaintiff has suffered damages from this disclosure. Before distribution of the confidential information, Plaintiff was a respected member of the San Mateo community.

425.    The tension has strained Plaintiff's family, business, and staff relationships, damaged future employment opportunities, and caused severe humiliation and embarrassment, making it difficult for him to engage personally and professionally, inclusive of with his family, co-workers in the Sheriff's Office, employers, and the community.

426.    Since the publications of news reports following the release of the confidential file, Plaintiff has been the subject of harassment and defamatory statements both online and in person.

Dr. Aenlle's reputation has suffered greatly, as many members of the community no longer trust or respect Plaintiff, and view him with contempt.

427.    As a direct result of the public disclosure of private facts by Defendants, Plaintiff has suffered damages including harm to reputation, loss of income and earning capacity, lost business opportunities, loss of employment, loss of enjoyment of loss of his government position or any future of positions in the County or in politics. Furthermore, Plaintiff has suffered severe emotional distress manifesting itself in physical symptoms.

428.    But for the disclosure of confidential documents, Plaintiff would not have been subjected to these damages.

429.    Defendants acted intentionally, oppressively, maliciously, and with a conscious disregard for the rights of others and with the intent to defraud, harass and annoy Plaintiff. Therefore, Plaintiff is entitled to punitive damages according to proof.

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief:

a.    Find that the County's actions unlawfully disclosed private facts causing harm;

b.    Award Plaintiff damages, pre-judgment interest, punitive damages, and reasonable attorneys' fees and costs against the County for having violated the Plaintiff's rights;

c.    Grant such other and further relief that this Court determines to be equitable, just, proper, or necessary under the circumstances.

<strong>Eleventh Claim</strong>

<strong>Ralph and Bane Act Violations (Cal. Civ. Code § 51.7, 52.1)</strong>

<strong>Against all Defendants</strong>

430.    Plaintiff incorporates and realleges the preceding paragraphs as if fully restated herein.

431.    California's Bane Civil Rights Act (Cal. Civ. Code § 52.1) holds that all people in California have the right to be free from any intimidation by threat of violence, committed against their persons or property based on political affiliation.

432.    California's Ralph Act (Cal. Civ. Code § 51.7) prohibits violence or intimidation by threat of violence committed against any person or property because of a person's position in labor dispute.

433.    The Bane Act (Cal. Civ. Code § 52.1), which authorizes actions to protect the exercise or enjoyment of rights secured under federal or California law, as well as upon the direct causes of action to enforce constitutional rights guaranteed under Article I, Section 2 and Article I, Section 7 of the California Constitution, as well as all forgoing provisions of the federal constitutional violations alleged above.

434.    "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." (*Austin B. v. Escondido Union Sch. Dist.* (2007) 149 Cal.App.4th 860, 883.)

435.    Defendants threatened, intimidated, and/or coerced Plaintiff's to resign from his employment and membership with the Sheriff's Office.

436.    Defendants threatened, intimidated, and/or coerced Plaintiff with respect to property applications and tests through ruinous fines and abusive land use accusations Plaintiff was not required to do under the law.

437.    By the Defendants' actions as described above, Defendants, acting in conspiracy and/or in concert, with threat, intimidation, and/or coercion, violated Plaintiff's rights under the Bane and Ralph Acts and interfered with the exercise or enjoyment of Plaintiff's clearly established rights secured by the Constitution and laws of the United States and Constitution and laws of California.

438.    Even in the absence of any excessive force, "[u]se of law enforcement authority to effectuate a stop, detention (including use of handcuffs), and search can constitute" a threat, intimidation or coercion. (*Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dept.*, 387 F. Supp. 2d 1084, 1102-05 (N.D. Cal. 2005).)

439.    Plaintiff's rights offended include the right to employment, freedom from unlawful enforcement, selective enforcement as to Plaintiff's property, to be free from unreasonable searches and seizures, to be free from government intrusion on private property, right to privacy, and many more. For example, the County's use of the Farm Task Force to gain unlawful entry to Plaintiff's property was threatening, intimidating and/or coercive.

440.    A reasonable person similarly situated to Plaintiff would have deem the County's actions coercive or intimidating and would have felt coerced and intimidated relative to real property and employment. Plaintiff was intimidated and coerced.

441.    The conduct of Defendants describe above was objectively unreasonable and was undertaken intentionally, willfully, with malice and with deliberate indifference to Plaintiff's rights.

442.    Attempted interference is enough to give rise to a Bane Act claim. (Civ. Code, § 52.1, subds. (a), (b); *Ramirez v. County of Los Angeles* (C.D. Cal. 2005) 397 F. Supp. 2d 1208.)

443.    Plaintiff's violation of his constitutional rights was directly and proximately caused by the policies and practices of Defendants, which were and are the moving force of the violations.

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief:

a.  Find that the County's actions violated the Ralph and Bane Acts;

b.  Award Plaintiff damages, pre-judgment interest, and reasonable attorneys' fees and costs against the County for having violated the Plaintiff's rights as provided for by California Civil Code §§ 51, 51.7, 52 and 52.1.

c.  Grant such other and further relief that this Court determines to be equitable, just, proper, or necessary under the circumstances.

## JURY DEMAND

Plaintiff, by and through their attorneys, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 28(b) on all triable issues.

DATED: September 17, 2025                    **FELLNER LAW GROUP**


*/s/Jason E. Fellner*
Jason E. Fellner, Esq.
Lindsay Hoopes, Esq.
Andrew Browning, Esq.
Attorneys for Plaintiff
VICTOR AENLLE

# EXHIBIT A

# COUNTY OF SAN MATEO
## COUNTY EXECUTIVE'S OFFICE

Michael P. Callagy
County Executive Officer /
Clerk of the Board

**County Government Center**
500 County Center, 5th Floor
Redwood City, CA 94063
650-363-4121 T
650-363-1916 F
www.smcgov.org

June 26, 2025

Fellner Law Group
90 Montgomery St., Suite 400
San Francisco, CA 94105

Notice is hereby given that the claim filed on behalf of Victor Aenlle, which was received in the office of the Board of Supervisors on May 2, 2025, and was presented to the Board of Supervisors on June 10, 2025, and rejected in its entirety by said Board.

WARNING:  Subject to certain exceptions, you have only six (6) months from the date this notice was personally delivered or deposited in the mail to file a state court action on this claim.  (See Government Code Section 945.6)

You may seek the advice of an attorney of your choice in connection with this matter. If you do desire to consult an attorney, you should do so immediately.

Very truly yours,

Michael P. Callagy, County Executive Officer/
Clerk of the Board of Supervisors

MPC:sp

cc:    John D. Nibbelin, County Attorney
       Jelena Barbarotto, Program Coordinator, County Attorney's Office
       Claimant:  Victor Aenlle



# EXHIBIT B

# ~~CONFIDENTIAL~~ EVALUATION BY FORMER JUDGE BURKE E. STRUNSKY OF RETIRED JUDGE LADORIS H. CORDELL'S REPORT OF HER INDEPENDENT INVESTIGATION INTO ALLEGATIONS OF MISCONDUCT BY VICTOR AENLLE, SHERIFF CHRISTINA CORPUS, AND THE LEADERSHIP OF THE SAN MATEO COUNTY SHERIFF'S OFFICE

## April 24, 2025

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................. 3

II.  SCOPE OF THIS EVALUATION ......................................... 4

III. EXPERIENCE AND BACKGROUND .................................. 5

IV.  GENERAL CONCERNS ..................................................... 6

   A.  BLACKBOX: SOURCE OF WITNESSES INTERVIEWED ................. 6

   B.  BASELINE BEST PRACTICES FOR CONDUCTING INTERVIEWS .................... 7

   C.  HYPERBOLIC TONE-SETTING EXCERPTS FROM THE CORDELL REPORT ................... 9

   D.   GENDERED DOUBLE STANDARDS IN ALLEGATION #1 ......................... 10

   E.  SINGLE-INVESTIGATOR CREDIBILITY FINDINGS CANNOT JUSTIFY OVERTURNING AN ELECTION ................................................................ 11

   F.  CHRONOLOGY AND CAUSATION BLURRED .......................... 12

   G.  COMPOUNDED METHODOLOGICAL WEAKNESSES .................. 12

V. WHY THE SHERIFF'S OFFICE POLICY MANUAL CANNOT LAWFULLY BE APPLIED TO SHERIFF CORPUS .................................. 13

   A.  THE SHERIFF IS A CONSTITUTIONAL OFFICER, NOT A DEPARTMENTAL EMPLOYEE OR MEMBER ................................................................ 13

   B.  SPECIFIC LANGUAGE IN THE POLICY MANUAL CONFIRMS NON-APPLICABILITY TO THE SHERIFF ................................................................ 14

   C.  PUBLIC POLICY SUPPORTS DISTINCT STANDARDS FOR ELECTED OFFICERS ........... 14

VI.  EVIDENCE OF AFFAIR ................................................. 15

VII.  ALLEGED RACIAL SLUR .............................................. 16

VIII.  ALLEGED HOMOPHOBIC SLUR ................................ 17

IX.  AN ABREVIATION MIX-UP AND ITS CONSEQUENCES ........... 18

X.  ALLEGATION OF ABUSE OF AUTHORITY ................... 20

XI.  BADGE ISSUE ................................................................ 21

XII.  CONCLUSION ................................................................ 22

## I.  INTRODUCTION

Representative governance endures only when the mechanism for displacing an elected officer is so transparent, evidentially sound, and verifiable that it instills confidence in reversing the democratically grounded electoral process that installed the officer. LaDoris H. Cordell's *Report of Independent Investigation into Allegations of Misconduct by Victor Aenlle, Sheriff Christina Corpus, and the leadership of the San Mateo County Sheriff's Office* practically commands the San Mateo Board of Supervisors to wield the formidable authority conferred by Proposition A on March 4, 2025, and remove Sheriff Corpus. However, if the Board treats Cordell's conclusions as unassailable—embracing, without a verifiable public record, her sweeping credibility judgments of more than forty anonymous witnesses—it will deploy that exceptional power upon an evidentiary void, bypassing the procedural safeguards on which democratic legitimacy depends.

Cordell, a trailblazing jurist and widely respected civic leader whose distinguished career spans decades of judicial and public service, deserves substantial deference; nonetheless, her investigation in this particular case lacks the procedural rigor that constitutional standards of due process demand. The report's principal findings rely on anonymous, hearsay-laden statements— many funneled through a single source, Civilian Witness #3—leaving no reliable basis to weigh credibility. A striking factual error, confusing Fortune 500 brokerage CBRE with Coldwell Banker, persisted until journalists exposed it, revealing a failure of basic verification. All forty interviews occurred by telephone; none were audio- or video-recorded (absent Aenlle), none transcribed, and no contemporaneous notes have been disclosed save the recording of Mr. Aenlle. Despite this evidentiary void, Cordell renders sweeping credibility judgments about forty unnamed witnesses, without revealing their motives or connections to Sheriff Corpus. The report supplies no dates, emails, documents, or other corroboration, shielding its accusations from independent testing. In twenty-five years evaluating investigations, I have never seen a decision-maker asked to render a decision of constitutional dimension—even more so, removing an elected officer—on an investigator's unsupported assurance that every unidentified witness is entirely credible no matter what her pedigree. Such a methodology would surely falter under judicial or administrative scrutiny and cannot sustain the extraordinary remedy of ouster.

The Board of Supervisors should invoke its gravest sanction only after subjecting the Cordell Report to the full scaffolding of due-process safeguards: sworn, recorded testimony; rigorous cross-examination; public disclosure of every note and memorandum; and independent, transparent review—protections that alone can convert allegation into proof. Without them the report remains a black-box narrative, anonymous voices trapped in unrecorded interviews, credibility judgments delivered in a chamber devoid of daylight. Elevating so opaque a manuscript to dispositive authority would announce that the electorate's mandate may be undone through procedures as shadowed as the witnesses themselves. Until adversarial testing and open scrutiny illuminate its contents, the report is procedurally infirm; it cannot underwrite a decision of this magnitude, nor withstand the corrosive effect such a precedent would have on public faith in self-government.

## II.  SCOPE OF THIS EVALUATION

On April 7, 2025, the law firm of Murphy Pearson Bradley Feeney retained me to conduct a narrowly focused, methodology-based evaluation of Judge LaDoris H. Cordell's November 12, 2024 *Investigative Report Into Allegations Of Misconduct By Victor Aenlle, Sheriff Christina Corpus, And Leadership Of The San Mateo County Sheriff's Office.*

My review is intentionally confined to the publicly released copy of Judge Cordell's November 12, 2024 report.[1] I did not solicit—and have never been given—any underlying source material (*inter alia*: exhibits, interview notes, recordings, correspondence, or document-production requests). Outside the report itself, I consulted only two readily accessible news articles, each cited to its online, infra from ABC-7's I-Team.

In sum, I was not retained to re-investigate the underlying events or to pronounce on the ultimate truth of each allegation. My sole charge is to assess whether the Cordell Report— considered in isolation—meets the standards of transparency, evidentiary rigor, and procedural fairness that due process requires before the Board of Supervisors may exercise the extraordinary authority, conferred by Proposition A, to remove an elected sheriff. My recommendation is remarkably simple: give Sheriff Corpus due process that matches the magnitude of the action being contemplated.

---

[1] Downloaded from: https://padailypost.com/wp-content/uploads/2024/11/CORDELL-REPORT-.pdf

### III.  EXPERIENCE AND BACKGROUND

For 25 years I have served at almost every level of California's justice system—charging, trying, and judging some of the state's most consequential cases. As an Assistant District Attorney in San Francisco and later a Deputy District Attorney in Riverside County, I took more than 100 felony jury trials to verdict with a 97% conviction rate. I tried and made filing decisions on thousands of violent-crime matters: homicides and attempted murders; sexual, child-, and elder-abuse prosecutions; cartel killings; home-invasion robberies; gang shootings; human-trafficking and child-exploitation schemes; hate-crime assaults; arsons; felony stalking; extortion; terroristic threats; and complex fraud.

Mid-career I was tapped for the office's paramount Homicide Team, an elite unit that assumed every murder investigation—often within hours of the victim's death—and carried each case from crime scene to sentencing. Working shoulder-to-shoulder with detectives, forensic scientists, and victim advocates, I shaped evidence-collection strategy, executed emergency search warrants, coordinated survivor and eyewitness interviews, and crafted the narrative that ultimately persuaded juries. Guiding a case from first call-out to final judgment sharpened my mastery of forensic science, digital evidence, and expert testimony while honing the disciplined credibility assessments that remain central to my practice. I also supervised investigations of officer-involved shootings—issuing charging recommendations when appropriate—and oversaw broader misconduct inquiries, producing comprehensive reports that informed subsequent proceedings.

Experience taught me that credibility is often case-dispositive, so I insisted on face-to-face interviews whenever possible—body language and demeanor convey more than half of human communication. I debriefed cooperation-seeking suspects, vetted would-be witnesses, and coached detectives on interview tactics while preparing grand-jury presentations and courtroom examinations. As a filing deputy and later a team leader, I reviewed thousands of police reports each year and decided whether charges—from misdemeanors to death-penalty homicides—should be filed, amended, or rejected. That front-line work demanded fluency in witness evaluation, forensic science, digital forensics, and complex expert testimony; I translated technical findings for juries and neutralized opposing experts when their science faltered or misled. I also drafted and executed hundreds of search warrants and directed specialized investigative teams probing officer-involved shootings and public-integrity cases.

Elected to the Riverside County Superior Court in 2016, I managed a high-volume docket spanning felony criminal, juvenile, civil, family, dependency, probate, and complex-litigation cases. I ruled on evidentiary and suppression motions; habeas petitions and constitutional challenges; civil-rights suits and sprawling discovery disputes; guardianships, conservatorships, adoptions, and dependency proceedings; mental-competency findings, sentencing issues, and a wide spectrum of pre- and post-trial motions—each demanding rigorous assessment of witness credibility, documentary proof, and burdens of persuasion. Concurrently, the Governor appointed me to the Judicial Selection Committee, where I collaborated and led confidential background investigations of would-be judges, interviewed attorneys, jurists, former clients, complainants, and community stakeholders, and produced analytical reports that guided gubernatorial appointments.

Today, as Special Counsel at Glenn Agre Bergman & Fuentes, I steer high-stakes litigation from strategy and discovery through depositions, trial, and appeal—handling complex and governmental investigations; white-collar and fiduciary-duty matters; business and contract disputes; fraud and unfair-competition claims; and constitutional and civil-rights actions.

## IV. GENERAL CONCERNS

### A. Blackbox: Source of Witnesses Interviewed

Cordell writes that she "interviewed 40 current and past sworn and civilian employees of the Sheriff's Office—precisely 25 sworn and 15 civilians—the great majority of whom were complainants" (Cordell Report p. 4). It is unclear to this reviewer if these 40 individuals interviewed included other specific names referenced in the report.[2] Beyond these aggregate figures, however, the report supplies no specific information about how those 40 names surfaced, who identified them, or what criteria governed their selection. It is unclear whether County Counsel furnished the list, whether Cordell solicited volunteers, or whether she undertook any

---

[2] Max Szabo, civilian adviser, San Mateo County transition team; Ryan Monaghan, Assistant Sheriff, San Mateo County Sheriff's Office; Chris Hsiung, Undersheriff, San Mateo County Sheriff's Office; Dan Perea, Undersheriff, San Mateo County Sheriff's Office; Carlos Bolanos, former Sheriff, San Mateo County; Iliana Rodriguez, Assistant County Manager, San Mateo County; Lisa Yapching, Classification & Compensation Manager, San Mateo County HR; Joann Lov, internal HR analyst, San Mateo County Sheriff's Office; Ed Barberini, Chief of Police, City of San Mateo.

independent effort to locate sources who might hold views favorable to—or at least neutral toward—the Sheriff's Office.

Cordell's Report offers no rationale or context for omitting the uncited interviews, leaving readers unable to determine whether their accounts were deemed irrelevant, insufficiently credible, or merely inconvenient to the report's thesis. Notably, Civilian Witness #3 was referred to more frequently than all the other anonymous witnesses combined (as cited above and in a footnote below and *infra*).

Cordell's report is a black box. Except for Mr. Aenlle, every interview was conducted off-camera, not in person, unrecorded, and undocumented; every credibility judgment rests exclusively on Cordell's untestable word[3]; almost all of the witness are given an anonymous number or moniker; and nearly half of the forty interviewees are not mentioned even once in Cordell's report without explanation. With no tapes, transcripts, contemporaneous notes, or underlying documents, neither the Board of Supervisors nor any court can replicate a single factual finding, probe a single recollection, or trace a single quotation to its source. That level of opacity defies the most basic norms of credible fact-finding, where the ability to review, challenge, and verify evidence is not a luxury but the bedrock of due process.

### B.  *Baseline Best Practices for Conducting Interviews*

Modern investigative literature speaks with near unanimity: when an inquiry abandons even a single basic safeguard—such as recording interviews, meeting witnesses in person, or allowing witnesses to review their statements—unnecessary doubt inevitably seeps in.  When, as appears true of the Cordell investigation, most of those guardrails are stripped away, decision-makers are left with little more than an investigator's unreviewable recollection and sweeping credibility claims.

I certainly recognize that no investigation can follow every best-practice to the letter, and practical constraints sometimes justify thoughtful departures. My critique therefore does not hinge on any single lapse but on the cumulative pattern of unrecorded interviews, undocumented witness selection, and uncorroborated hearsay. It is this aggregate shortfall—rather than a

---

[3] This report should not be interpreted to imply any level of dishonesty or lack of credibility on the part of Judge Cordell. In fact, this Reviewer has great respect for Judge Cordell and her distinguished career, public service, and groundbreaking accomplishments.

hindsight "Monday-morning quarterback" of individual choices—that raises doubts about the investigation's overall reliability.

Nine practices that contemporary investigators should follow, which Cordell may not have, are listed below, along with the sources of the protocols cited:

1. **Create an objective, contemporaneous record (audio or video)**

   Recording preserves exact words, tone, and cadence; it eliminates later disputes and allows independent reviewers to assess credibility. *Sources: U.S. Department of Labor, Office of Enforcement Manual, ch. 3 § B(3) (2023), available at **https://www.dol.gov/sites/dolgov/files/WHD/about/FLSA/foh/Chapter3.pdf**; American College of Trial Lawyers, "Recommended Practices for Conducting Internal Investigations," p. 8 (2020), available at **https://www.actl.com/docs/default-source/default-document-library/publications/task-force-reports/recommended-practices-for-conducting-internal-investigations.pdf***.

2. **Interview in person whenever feasible:**

   Telephone or virtual sessions forfeit non-verbal cues—eye contact, posture, micro-expressions—long recognized as vital to gauging sincerity. *Source: International Association of Chiefs of Police (IACP), "Best Practices Guide for Internal Affairs," p. 9 (2018), available at **https://www.theiacp.org/sites/default/files/2018-08/BP-InternalAffairs.pdf***.

3. **Use at least two trained investigators or employ an independent peer reviewer:**

   Dual-observer models curb unconscious bias and allow immediate cross-checking of notes, boosting reliability. *Cited in ACTL, "Internal Investigations," p. 7 et seq. (see ACTL URL above).*

4. **Provide witnesses a chance to review and adopt their statements:**

   Furnishing a verbatim transcript (or recording) lets witnesses correct or clarify, locking in testimony and minimizing later disputes. *Source: U.S. Department of Labor Manual, ch. 3 § B(4) (2023), URL above.*

5. **Preserve all raw materials and maintain an auditable chain of custody:**

   Notes, drafts, exhibits, recordings, and metadata must be retained so subsequent reviewers can verify findings. Destruction or withholding of underlying materials is a

red flag. *Source: IACP, "Best Practices Guide for Internal Affairs," pp. 8-9 (2018), URL above.*

6. **Document investigative methodology in writing:**

   Memorialize how witnesses were selected, interview logistics, who was present, documents shown, and any limitations. Transparency enables later decision-makers—and courts—to assess sufficiency. *Discussed throughout ACTL and IACP guides (see URLs above).*

7. **Avoid leading or compound questions and disclose exculpatory information:**

   Neutral, open-ended questioning elicits uncoached narratives; withholding contrary facts until late in the interview tests spontaneous recall and deters tailored answers. *Source: California Commission on Peace Officer Standards and Training (POST), Learning Domain 25 — Interview & Interrogation (current edition), available at **https://post.ca.gov/Portals/0/post_docs/publications/LD25.pdf**.*

8. **Re-interview key witnesses when new evidence emerges:**

   Significant inquiries often span months; responsible investigators reconvene witnesses if later-discovered documents, emails, or texts shift the factual landscape. *Source: ACTL, "Internal Investigations," p. 11, URL above.*

9. **Separate credibility analysis from fact narration and articulate the basis:**

   Credibility findings should rest on identifiable factors—corroboration, motive, demeanor, prior inconsistent statements—rather than conclusory assertions. *See ACTL, pp. 9-10; IACP, p. 12.*

### C.  Hyperbolic Tone-Setting Excerpts from the Cordell Report

Cordell's opening salvo—"*Lies, secrecy, intimidation, retaliation, conflicts of interest, and abuses of authority are the hallmarks of the Corpus administration...Nothing short of new leadership can save this organization*" (Cordell Report p. 2)—is not merely colorful prose; it is a sweeping legal conclusion delivered before any evidence is laid out. An investigator billed as "independent" is expected to gather verifiable facts and present them neutrally, leaving ultimate judgments to the decision-maker. By calling for the Sheriff's removal on page two, Judge Cordell assumes the adjudicative role that Proposition A reserves to the Board of Supervisors, collapsing the line between fact-finder and advocate. That rhetorical choice invites readers to accept the aphorism and skim past the hundreds of pages of hearsay-based allegations that

9

follow, thereby skewing the Board's ability to engage in the sober, granular analysis the statute requires.

Early, absolutist language also signals confirmation bias: once an investigator announces that an agency is "in utter disarray" and "obsessed with loyalty that borders on paranoia" (Cordell Report pp. 91-92), every subsequent datum risks being interpreted to fit the thesis. The danger is magnified here because the record is opaque—interviews were unrecorded, witnesses remain anonymous, and no contemporaneous notes are provided (Cordell Report p. 4). With no way to test tone, context, or leading questions, the Board must rely entirely on the investigator's credibility calls; incendiary rhetoric grafted onto an unreviewable record converts untested assertions into quasi-facts.

Finally, the report's advocacy posture exceeds the undefined mandate under which it was commissioned and jeopardizes the due-process architecture built into Proposition A. The charter amendment contemplates a written statement of charges, an opportunity for sworn testimony, and a public hearing before the Board exercises its extraordinary power to remove an elected Sheriff. If the Board were to treat Cordell's hyperbolic judgments as dispositive, it would invert that sequence—punishment first, evidence later—inviting legal challenge and undermining public confidence in the removal process. A truly independent report would have reserved such ultimate conclusions for the Board, after a transparent evidentiary hearing, rather than foreclosing deliberation with sweeping rhetoric at the outset.

### D.  Gendered Double Standards in Allegation #1

The Cordell Report's most sensational allegation—that Sheriff Corpus and Executive Director Aenlle carried on an "intimate relationship" so corrosive it crippled the Sheriff's Office—rests on little more than single-sourced hearsay. The narrative is stitched from a handful of vignettes: three fleeting text messages, one alleged hallway kiss, an ambiguous Zoom screen, talk of Tiffany earrings and a Maui wedding, and a few late-night departures. Every detail traces back to a single source— "Civilian Witness #3." No emails, travel logs, financial records, photographs, or independent witnesses corroborate any of it. Nevertheless, the Report inflates these fragments into the sweeping conclusion that Sheriff Corpus "relinquished control" of a 1,100-employee agency to a civilian aide (Cordell Report p. 19). A substantial research record shows that women leaders are often judged through a sexualized lens that reframes routine workplace conduct as romantic or improper; identical behaviors are sexualized

sooner and condemned more harshly for women than for men (Eagly & Karau, "Gender and the Emergence of Leaders: A Meta-Analysis," *Psychological Bulletin* 109: 233-256 (1991); Heilman & Parks-Stamm, "Gender Stereotypes in the Workplace," *Research in Organizational Behavior* 24: 47-94 (2007); Ridgeway, "Framed Before We Know It: How Gender Shapes Social Relations," *Gender & Society* 17: 129-150 (2003); Catalyst, *The Double-Bind Dilemma for Women in Leadership* (2007)). These patterns do not dictate the outcome of any single case, but they underscore why robust corroboration is essential before converting unverified impressions into formal findings—especially when the target is the county's first woman and first Latina Sheriff.

Fundamental investigative practice—and basic due-process norms—require contemporaneous documents or multiple independent witnesses before recommending a remedy as drastic as removal of an elected constitutional officer. The Cordell investigation supplied neither. By elevating a lone witness's untested perceptions to fact, the Report substitutes inference for proof and fuels the perception—grounded in decades of gender-bias research—that identical conduct is scrutinized far more suspiciously when the actor is a woman, especially once allegations of workplace romance enter the frame. This "intimate relationship" finding is the keystone for the Report's later conclusions on conflicts of interest, retaliation, and abdication of command; when the keystone is shaky, every arch it supports is unsound. Recommendations as extraordinary as ousting an elected Sheriff must rest on rigorous, objective evidence—not conjecture spun from a single, uncorroborated source.

### E. Single-Investigator Credibility Findings Cannot Justify Overturning an Election

The Board of Supervisors is being urged to invoke the most drastic remedy the county charter permits—nullifying the electorate's choice and expelling a constitutional officer—on nothing more than a single investigator's un-reviewable assurance that forty unnamed accusers "were credible." Judge Cordell recorded none of her forty interviews (absent Aenlle), appears to have kept no verbatim notes, and concealed most witness's identity. Without tapes, transcripts, or even contemporaneous memoranda, neither the Board nor a court can compare tone, context, or possible leading questions, let alone test the accounts for exaggeration, misunderstanding, or fabrication (Cordell Report p. 4). The blanket statement that "all witnesses were credible" is therefore no evidence at all; it is the kind of ipse dixit that collapses under its own weight.

Because every credibility call rests with a single, interested evaluator, time-honored safeguards—second-reader review, panel deliberation, and adversarial cross-examination—never occurred. Well-established guidance for high-stakes investigations, from DOJ internal-affairs standards to corporate-governance treatises, warns that unchecked, one-person credibility determinations invite unconscious bias and confirmation error. Those risks become intolerable when the consequence could be overturning an election. Worse still, the narrative is driven by one anonymous witness: "Civilian Employee #3" is cited more than a dozen times and supplies the report's most incendiary claims, yet public reporting shows she vowed to "take [Sheriff] Corpus down" after being denied a promotion (ABC7 I-Team Mar. 6 2025). The investigation hides the witness's motive, demeanor, and lack of corroboration, leaving the Board nothing to probe. In short, absent recordings, disclosed identities, or articulated credibility metrics, the report offers only the investigator's say-so—the antithesis of due process. Courts routinely overturn administrative findings built on such an undeveloped record, and the Board should demand at least that much rigor here.

### F.  *Chronology and Causation Blurred*

 Section 412.5, added to the San Mateo County Charter by Proposition A, empowers the Board of Supervisors to remove a sheriff only for causes "related to the performance of the sheriff's duties" and only after written notice and a hearing. That phrasing presumes the person is already in office and performing those duties; events that occurred before the January 2023 swearing-in simply cannot be "related" to them. (San Mateo County Charter § 412.5(a)).

The report blends pre and post-inaugural events and at points attributes Mr. Aenlle's conduct to Sheriff Corpus without explaining how—if at all—she directed or approved it. Proposition A permits removal only for "cause" that arises from the Sheriff's own performance after taking office. Unless the chronology is disentangled and individual roles are kept distinct, the Board cannot know which facts, if any, constitute post-inaugural misconduct by the Sheriff herself. Separating timelines and actors is therefore essential both to inform the Sheriff of the precise charges and to satisfy fundamental due-process protections.

### G.  *Compounded Methodological Weaknesses*

When hearsay dependence, anonymous sourcing, single-investigator credibility rulings, unrecorded interviews, and expansive causal inferences are combined, the methodological fragility of the report becomes apparent. Removal of an elected official is a direct intrusion on

the electorate's choice; the underlying investigation must therefore meet the highest standards of objectivity, clarity, transparency, verifiability, and ability to recreate. In its current form, the Cordell Report does not furnish the Board of Supervisors with evidence sufficiently robust to justify such a consequential constitutional action.

## V.   WHY THE SHERIFF'S OFFICE POLICY MANUAL CANNOT LAWFULLY BE APPLIED TO SHERIFF CORPUS

The San Mateo County Sheriff's Office Policy Manual declares that it is directed to "Sheriff's Office employees" and assigns duties to subordinate ranks—captains, lieutenants, sergeants, deputies, and civilian staff—who operate within a supervisory chain of command. (Sheriff's Office Policy Manual, §§ 1025.1, 200.3, 201.1-.2.) Those provisions explain that "Captains and Directors assist the Undersheriff and Assistant Sheriff in carrying out Sheriff's Office policies; administer and supervise work," language that presupposes an employer-employee hierarchy and excludes the Sheriff from the Manual's functional scope.

The Sheriff, by contrast, occupies an independent constitutional office filled by county-wide election. Article XI, section 1, subdivision (b) of the California Constitution authorizes counties to elect a sheriff, and Government Code section 24000 places that office on the roster of county constitutional officers. Because the Sheriff derives authority directly from the electorate—not from appointment or contract—the Policy Manual, drafted for departmental employees, does not govern the Sheriff's official conduct.

### A.   The Sheriff Is a Constitutional Officer, not a Departmental Employee or Member

California statutory text mirrors a century of case law distinguishing county officers—whose authority flows directly from the electorate or the Constitution—from county employees who serve at will. The Meyers–Milias–Brown Act expressly removes elected officials from its bargaining framework by defining a "public employee" as any county worker "excepting those persons elected by popular vote." (Gov. Code, § 3501, subd. (d).) Consistent with that exclusion, Government Code section 24001 provides that county officers "shall not be deemed employees of the county," a separation the Legislature has replicated in the Public Employees' Retirement Law, which omits "officers elected by … popular vote" from the definition of "employee." (Gov.

Code, § 20322, subd. (a).) The Labor Code likewise declares that an "elected paid public officer" is not an "employee" for workers-compensation purposes. (Lab. Code, § 3351, subd. (b).)

California courts enforce the same bright line. In *Mono County v. Industrial Accident Commission* (1917) 175 Cal. 752, the Supreme Court held that an elected sheriff "is not an employee within the meaning of the Workmen's Compensation Act," because a public office "is not held by contract" and owes its existence to the Constitution rather than to any hiring authority. Subsequent cases uniformly treat elected officers as holders of office, not employees, for purposes ranging from wage-and-hour statutes to collective bargaining.

Collectively, these enactments and precedents remove the Sheriff from the class of persons whom county HR instruments—including the Lexipol Policy Manual—can regulate. The Manual's provisions apply only to "employees" (Policy Statement, p. 1), a term that cannot be stretched to encompass a constitutional officer whom the voters, not the County, have installed. Because Sheriff Corpus occupies an office defined by article XI, section 1(b) of the California Constitution and filled by county-wide election, she stands outside the employment hierarchy addressed by departmental policies. Those policies therefore cannot supply the legal yardstick for judging her conduct; any restraint on her authority must come from the Constitution, applicable statutes, or duly enacted ordinances—not from internal HR rules drafted for subordinate personnel.

## B. *Specific Language in the Policy Manual Confirms Non-Applicability to the Sheriff*

The Manual states that supervisory personnel "assist the Undersheriff and Assistant Sheriff" in implementing policy, illustrating a subordinate hierarchy incompatible with the Sheriff's independent status. (Sheriff's Office Policy Manual, § 201.1(d).) It further provides that requests for outside employment, pay, or discipline require the Sheriff's approval, underscoring that the Sheriff is the ultimate authority, not an employee subject to oversight. By its own terms, therefore, the Manual regulates subordinates, not the constitutional officer who issues and enforces it.

## C. *Public Policy Supports Distinct Standards for Elected Officers*

Democratic accountability flows directly from the ballot box. Employee manuals, by contrast, are management tools written for staff who serve within an internal chain of command. If those manuals were applied to an elected Sheriff, unelected administrators could second-guess

the voters' choice except where the Charter or state law expressly allows. That result would blur the constitutional line between popular sovereignty and routine personnel oversight.

*This institutional distinction is not a license to ignore legal or ethical norms.* The Sheriff remains fully subject to statewide conflict-of-interest statutes—such as Government Code section 1090 and the Political Reform Act—as well as the Penal Code, Government Code, and the County Charter. The point is simply that rules drafted for employees cannot be stretched to cover an independent constitutional officer unless the Board formally legislates that extension.

Because the Policy Manual's conflict-of-interest provision was written for deputies and civilian staff, it does not, by its own terms, govern the elected Sheriff. Any evaluation of Sheriff Corpus's conduct must therefore rest on legal authorities that indisputably bind elected officials, not on an internal handbook directed at subordinates.

## VI.  EVIDENCE OF AFFAIR

Virtually every detail that Cordell cites as proof of an affair originates with a single source—Civilian Employee #3—and remains entirely uncorroborated. No screenshots, receipts, e-mail chains, Signal logs, hotel records, surveillance footage, or contemporaneous notes have been produced to verify her account of "*Baby, I love you*" texts, a "peck on the lips," late-night outings, or the alleged $12,000 Tiffany-earring purchase. Both Sheriff Corpus and Mr. Aenlle expressly deny any intimate relationship, and nothing in the record independently contradicts those denials.

The handful of remarks attributed to other employees (e.g., a private weapons-range session, Mr. Aenlle's overheard "*Te amo*," or parking in the Sheriff's reserved spot) do not, on their face, establish romance or impropriety. At most they show access, not intimacy.

Significantly, Cordell's report contains no documentary exhibits—texts, photographs, receipts, or audio—that directly substantiate Civilian Employee #3's narrative.
In short, the affair allegation rests on a single witness's recollection, unsupported by documents or corroborating testimony. Given these evidentiary gaps and the unequivocal denials from both principals, the claim of an intimate relationship remains unproven. Here is a chart laying out the entirety of the evidence Cordell cites to support the existence of an affair.

| Alleged Fact | Source cited by Cordell | Documentary Evidence Produced? | Cordell Report page no. |
|---|---|---|---|
| "Baby, I love you, I miss you so much" text on Sheriff's phone | Witness #3 | None | 12 |
| Peck on lips in Millbrae office | Witness #3 | None | 12 |
| Zoom call: feeding each other / "footsie" at ranch | Witness #3 | None | 13 |
| Request to plan Maui wedding sites | Witness #3 | None (Signal messages not produced) | 14 |
| $12,000 cash for Tiffany earrings; Sheriff shows earrings | Witness #3 | Link to web ad only; no receipt or message | 14 |
| Christian Louboutin boots bought by Aenlle | Witness #3 | None (receipt only seen by witness) | 14 |
| "Practicing a lot to have kids" remark | Witness #3 | None | 14 |
| Late night departures together; husband upset | Witness #3 | None | 15 |
| Election night quarrel ("How dare you thank…") | Witness #3 | None | 15 |
| Range qualification in private session | Sworn employee #30 | Qualification sheet disputed; no affair evidence | 12 |
| "Te amo" overheard on phone | Civilian employee #6 | None; hearsay only | 18 |

## VII.  ALLEGED RACIAL SLUR

The Cordell Report rests its likely most morally reprehensible accusation of racist language on a single source: Civilian Witness #3, who claims that during a muted Zoom meeting in January or February 2022—well before Sheriff Corpus assumed office—she twice whispered the "n-word" while looking at the screen (Cordell Report p. 90). No recording exists; no other participant heard anything; and no contemporaneous note, email, or text message supports the account. Among forty interviewees—many of whom are openly hostile to the Sheriff—not one person corroborates the alleged remark (Cordell Report p. 90).

16

The only documented incident in the Report that directly involves racist language points in precisely the opposite direction. Within months of taking office, Sheriff Corpus ordered that a deputy who used a racial slur on body-worn video be fired rather than permitted to resign, a decision the Report details on page 29 (Cordell Report p. 29).

Accepting Witness #3's story would therefore require believing that a Sheriff who had just imposed the harshest penalty for a subordinate's slur privately uttered—and repeated—an even more deplorable epithet with no witness but Civilian Witness #3 and no trace of documentation. Nothing in Sheriff Corpus's long public record—spanning decades in law enforcement under constant scrutiny—shows even a hint of racial hostility. The notion that she would suddenly, and for the only time in her career, whisper the most incendiary slur in the English language during a muted Zoom call strains credulity. Yet Cordell treats the accusation as established fact, discarding the complete absence of corroboration and the Sheriff's documented discipline of subordinates for bigoted speech. To accept so thin a reed as proof would normalize the removal of elected officials on the strength of a lone, unverified allegation—an alarming precedent that threatens both due process and democratic accountability.

## VIII.  ALLEGED HOMOPHOBIC SLUR

Civilian Witness #3 says an incident began during the 2022 campaign, when she and Captain Corpus were (working together to get Sheriff Corpus elected) exchanging messages about politics and local personalities. According to her, on July 13, July 25, and August 15 of that year, Corpus sent her the same text describing a lesbian city-council member as a "FuzzBumper." More than two years later, when Cordell's investigation was under way, Witness #3 produced three cropped screenshots that displayed only the disputed word and a first name—no date stamp, no sender information, no surrounding messages, and no phone metadata. Exhibit 46 contains nothing else.

To be clear, any language that demeans or disparages someone on the basis of sexual orientation is unacceptable and has no place in professional or personal discourse; however, this allegation rests on the uncorroborated account of a single witness and concerns a public official who has never previously been reported to have uttered any such slur in any context. The narrow question is therefore whether this scant evidence suffices to establish a violation of the County's EEO policy.

The problem is that Civilian Witness #3's credibility is badly compromised. ABC 7 obtained an interview with a Millbrae official who says that, after Corpus took office and did not promote her, Civilian Witness #3 told him on at least a dozen occasions that she intended to "take [the Sheriff] down" and would "do anything" to make that happen (ABC7 I-Team report, March 6, 2025).

The Cordell Report says nothing about Witness #3's motives or her past relationship with Sheriff Corpus. It also omits the fact that she was once a public cheerleader for Corpus's election campaign and later an outspoken champion of Proposition A—a complete, unexplained reversal of loyalty that bears directly on her credibility.

When ABC 7 confronted Sheriff Corpus with the screenshots of the above texts, she flatly denied authorship: "It's not my text; I did not send that. I had to look up what that term meant." (ABC7 I-Team report, March 6, 2025[4])[5] The investigation did not test that denial. The specifics of any device examination were not exposed or shared, no expert linguistic analysis, and no attempt to place the sheriff's phone at the times the messages were allegedly sent. Nor did any of the over forty other witnesses interviewed by Cordell recall ever hearing Corpus use homophobic language.

Thus the entire allegation hangs on one compromised witness, three unverified screenshots, and an obscure phrase whose offensive meaning is asserted but not demonstrated. The investigative steps that could have confirmed or disproved authorship were never taken; the potential bias of the sole accuser was never explored; and the leap from ambiguous, unauthenticated images to an official finding of discriminatory conduct was made without independent proof. In a matter carrying reputational stakes this high, the evidence offered is simply too thin to sustain the charge.

## IX.  AN ABREVIATION MIX-UP AND ITS CONSEQUENCES

Cordell mistakenly equated the initials "CBRE" on the June 15 2023 Letter of Intent with "Coldwell Banker Real Estate." Building on that misidentification, she asserted that Coldwell Banker brokered the Broadway lease, proclaimed that Victor Aenlle's denial "stretches

---

[4] https://abc7news.com/post/exclusive-key-witness-get-san-mateo-county-sheriff-christina-corpus-credibility-questioned-public-official/15981419/

[5] To be clear, Sheriff Corpus did not agree to the interview despite being given several dates by Corpus (Cordell Report pp. 4,5).

credulity," and told the Board the deal was "likely a lucrative one for Coldwell Banker" (Cordell Report pp. 68–72). This single factual error underlies her entire conflict-of-interest finding and, as shown below, exemplifies the investigative shortcuts that run through her 380-page report.

Before making that leap, Cordell questioned Aenlle in a manner that plainly signaled she thought he was lying. She pressed, "So my question to you is did you know that *Coldwell Banker* was the broker for this lease?" and, moments later, declared, "There were three individuals who were the brokers for this lease, and they are people who *work for Coldwell Banker*" (Ex. 1 to Cordell Report pp. 35–36). Despite Aenlle's repeated answer— "Ma'am, I don't think that is correct" and "I never met Mr. McSweeney before in my life"— Cordell returned to the theme, telling him that his denial "stretches credulity." Those exchanges show she had already adopted the Coldwell Banker theory and was inviting the witness either to confirm it or to appear dishonest.

In reality CBRE[6] is the Fortune-500 commercial firm CB Richard Ellis[7], a company entirely unrelated to Coldwell Banker. A rudimentary Google search or a telephone call to the broker named in the lease—Bob McSweeney—would have revealed the distinction; when contacted by ABC-7's I-Team he confirmed the firms are "totally different companies" and that he had never met Aenlle. Cordell never undertook those basic steps, never secured the recorded lease herself, and excluded 29 pages of Aenlle's interview transcript that contained his strongest denials. After months of follow-up she conceded to the Mercury News on December 2, 2025 (12:34 a.m.) that she was wrong about the broker, yet she insisted the error "does not change any conclusion" in her report.

The CBRE-versus-Coldwell-Banker blunder is not a trivial footnote—it is a window into the report's larger investigative breakdown. Judge Cordell sustains Allegation #6 on the assertion that "CBRE" stands for "Coldwell Banker Real Estate," inferring that Victor Aenlle secretly brokered the Broadway lease for his own firm and thus had a financial conflict (Cordell Report pp. 68, 71). A thirty-second search reveals CBRE is an unrelated Fortune-500 company, yet this basic misidentification—visible on the very Letter of Intent the investigator cites—went uncorrected even after public scrutiny. Because that error supplied the predicate for branding Aenlle "not credible," its persistence exposes a methodology that pronounces grave conclusions

---

[6] https://www.cbre.com/about-us
[7] https://www.coldwellbanker.com

before verifying elementary facts, records only select interviews, and credits anonymous hearsay over documentary confirmation. If such a glaring mistake survived the report's quality controls, every unrecorded, uncorroborated claim resting on those same controls is cast into doubt—fatally undermining the reliability required to justify removing a constitutionally elected Sheriff.

## X.  ALLEGATION OF ABUSE OF AUTHORITY

Cordell asserts that Sheriff Corpus allowed Victor Aenlle to "move himself to the top of the Chain of Command," exercising authority over sworn and civilian personnel with the Sheriff's blessing (Cordell Report p. 25). Yet the record she provides does not sustain that charge, nor does it untangle what Aenlle actually did from what staff merely perceived.

To begin, Cordell points to no order, memo, or organizational chart showing Aenlle formally placed "at the top" of the command structure. Indeed, she concedes that no finalized chart even existed during her investigation (Cordell Report p. 6). In the sole recorded interview, Aenlle himself characterizes his status as "civilian staff," explaining that the Undersheriff—not he—was drafting the chart still in progress (Ex. 1, Aenlle Transcript). That admission cuts against any suggestion of an official re-alignment elevating him above sworn leadership.

Cordell next relies on anonymous, unrecorded statements that Aenlle "inserted himself" into press releases, briefings, and personnel meetings (Cordell Report pp. 27-30). But those anecdotes are untethered to dates, documents, or corroborating witnesses. She furnishes no emails, directives, or minutes showing that Aenlle issued orders, overruled sworn commanders, or otherwise exercised coercive power. Nor does she identify a single instruction from Sheriff Corpus delegating such authority.

The only concrete paperwork is Aenlle's extra-help appointment as Executive Director of Administration (Ex. 11 to Cordell Report). That job description covers strategic planning, logistics, and interagency coordination—functions routinely handled by civilian chiefs of staff in other law-enforcement agencies. It confers no operational command over deputies.

Ultimately, Cordell substitutes staff impressions of influence for evidence of abuse. She never articulates a legal or policy standard defining "abuse of authority," yet declares the standard breached. Absent a benchmark, the conclusion is necessarily subjective; organizational discomfort is not misconduct.

In sum, the allegation rests on a vague, undocumented foundation. There is no written delegation vesting Aenlle with command powers, no proof that he exercised them, and no cited

rule that would render his civilian role unlawful. At most, the Sheriff may be faulted for unconventional staffing or poor internal communication—hardly the constitutional predicate for removal under Proposition A. The claim therefore falls well short of the due-process and evidentiary threshold required for so extraordinary a sanction.

## XI.  BADGE ISSUE

Penal Code § 538d addresses fraudulent impersonation, not badge color or rocker size. Subdivision (a) forbids wearing any peace-officer indicia "with the intent of fraudulently impersonating a peace officer," and subdivision (b)(2) makes it a misdemeanor to display a badge that would deceive "any ordinary reasonable person" if accompanied by that fraudulent intent (Pen. Code § 538d, subds. (a), (b)(2)). Two published Attorney-General opinions confirm that the statute turns on deception and intent: the 2007 opinion invalidates honorary badges only when they are likely to fool the public (90 Ops.Cal.Atty.Gen. 57 (2007) at 64-66), while the 2009 opinion expressly authorizes badges for non-sworn employees with limited powers so long as the badge accurately states the bearer's role (92 Ops.Cal.Atty.Gen. 46 (2009) at 49-50).

Victor Aenlle's badge satisfies San Mateo County Sheriff's Policy 1026.2.2, which requires that civilian badges "be clearly marked to reflect the position of the assigned employee"; his rocker reads "Chief of Staff," plainly identifying him as a civilian executive (Sheriff's Policy Manual § 1026.2.2, p. 706). No witness or document indicates that Aenlle ever used the badge to detain, arrest, or compel compliance; Cordell's sole basis is that "from a distance, it could look like" a deputy's shield (Cordell Report p. 86). Taken literally, that yard-arm standard would outlaw every civilian or prosecutorial badge in California, because any rocker—no matter how clear—becomes unreadable at range and thus could equally "look like" a sworn badge. Without evidence of deceptive intent or actual confusion, the elements of § 538d are not met (Pen. Code § 538d, subd. (b)(2); 90 Ops.Cal.Atty.Gen. 57, supra, at 64).

Gold-tone badges for civilian executives are common statewide. Assistant and Deputy District Attorneys—including during my fifteen years as a prosecutor—routinely carry gold badges that resemble those of sworn deputies; the rocker identifies them as prosecutors, and no one has suggested they violate Penal Code § 538d. Whether allowing any non-sworn employee to display a police-style badge is wise policy is debatable, but the practice is widespread. Cordell's contrary reading is, at best, pedantic. If her interpretation were correct, hundreds of prosecutors (myself included for fifteen years—see Exhibit A, photographs of my badges) would

be guilty of a misdemeanor every workday. Her collateral claim about honorary badges fares no better: the 2007 Attorney-General opinion allows volunteer or commemorative badges so long as their design and labeling prevent confusion, and the investigative record contains no evidence that the plaques, draft ID card, or unissued badges she cites could deceive an ordinary observer.

## XII.  CONCLUSION

Due process is the bedrock of constitutional governance; without it, even well-intentioned remedies risk eroding the electorate's faith in those who govern. As Justice Joseph Story explained in his classic *Commentaries on the Constitution*, "The impeachment power is not so much designed to punish an individual, as to secure the state against gross official misdemeanors." (3 Story, *Commentaries on the Constitution of the United States* § 795 (1833)) This evaluation therefore asks a single, threshold question: does Judge Cordell's November 12, 2024 report deliver the transparent, corroborated, and independently reviewable proof that must precede any attempt to unseat a county-wide elected sheriff? After examining the record of unrecorded telephone interviews, anonymous hearsay, and solitary credibility rulings—set against a near absence of documentary verification (Cordell Report p. 4)—the answer remains no. Under Proposition A, removal of an elected sheriff demands "cause" established through procedures that match the gravity of nullifying the electorate's choice (§ 412.5). Acting on so fragile a foundation would trade the transparency promised to voters for the opaque assurance of a single investigator—and in so doing set a precedent corrosive to every future exercise of democratic oversight.

Cordell's investigation has undeniable value—but only as the point of departure, not the destination. Her report surfaces a host of serious allegations, yet it rests on an evidentiary lattice too frail to carry the constitutional load of overturning an election: forty anonymous, unrecorded interviews (except Aenlle), apparently no verbatim notes, and blanket assertions of credibility that no independent reviewer can test. As Justice Harlan warned, "*The right to hold office, once conferred by the people, is a valuable part of the liberties of the citizen.*" (*Taylor v. Beckham*, (1900) 178 U.S. 548, 605 (1900) (Harlan, J., dissenting)) Alexander Hamilton likewise cautioned in *Federalist* No. 65 that "*The subjects of [the impeachment] jurisdiction are those offences which proceed from the misconduct of public men … from the abuse or violation of some public trust,*" (Hamilton, *The Federalist* No. 65 (1788) (Cooke ed. 1961)), underscoring that removal must rest on proof of genuine abuse rather than political impulse. If the County were to act now,

it would substitute that liberty for an unreviewable judgment and undermine the democratic principle that the people—not a single investigator—decide who governs.

The path forward lies in neither shelving Judge Cordell's work nor rushing to depose an elected sheriff. What San Mateo County needs—and what the charter now empowers—is a transparent, meticulously staged public hearing that converts allegation into demonstrable fact or, just as readily, into demonstrable error. In that forum, every witness must testify under oath and on the record; every interview note, email, and exhibit must be produced; every assertion must withstand exacting cross-examination; and Sheriff Corpus must enjoy an unfettered right to confront her accusers and answer each charge in full view of the electorate. Only such an architecture of due process can transform this moment of crisis into a civic exemplar—a proceeding future generations can cite as the gold standard for democratic accountability. By demanding nothing less, the Board will honor the voters who chose their sheriff and the very amendment that entrusts them with the power to remove her for cause, proving that in San Mateo County even the gravest accusations are resolved not by fiat, but by procedures so fair and transparent that they strengthen faith in self-government itself.

.

Respectfully Submitted,

*Burke Strunsky*

*Former Judge Burke E. Strunsky*

EXHIBIT A



EXHIBIT B



# EXHIBIT C



**COUNTY** OF **SAN MATEO**
**PLANNING AND BUILDING**

455 County Center, 2ⁿᵈ Floor | Mail Drop PLN 122
Redwood City, CA 94063
(650) 363-4161
planning.smcgov.org

September 2, 2025

Jason E. Fellner
Lindsay Hoopes
90 New Montgomerey St, Suite 400
San Francisco, CA 94105

**SENT VIA E-MAIL**

Dear Jason Fellner and Lindsay Hoopes:

       Re:    Marina and Victor Aenlle, APN 036-300-060 (VIO2024-00192)

I am in receipt of your letter dated August 21, 2025, regarding APN 036-300-060 (Property).  I enclose the responsive records you requested under the Calfornia Records Act and address a number of statements in the letter.

*First*, your claim that the County's most recent letter to your clients, dated August 7, 2025, did not provide achievable deadlines ignores the fact that your clients were initially informed of the violations and the necessary abatement actions nearly a year ago on September 24, 2024, with follow up letters further describing the required actions on October 25, 2024, December 11, 2024, and May 22, 2025.  To date, however, your clients have not made meaningful progress on any of the identified abatement actions.

As a result, we are hereby recommending the issuance of administrative penalties, in the amount of $500 per day, effective today.  Unless we receive the previously identified information and materials by September 19, 2025, the penalties will increase to a daily fine of $500 per day for each violation that continues to exist on the Property.

*Second*, your letter incorrectly states that there are no life safety concerns on the Property.  To the contrary, the absence of permits for the many structures contained on the site, as well as for the water and wastewater infrastructure, and inadequate emergency access to the Property and fire suppression supplies all present significant health and safety concerns that must be addressed through the permitting process.

Fellner and Hoopes                          - 2 -                          September 2, 2025

*Third*, in response to your statement that the Aenlles were denied attendance at prior meetings, I note that at no time did County staff indicate that they were not welcome at any of the meetings that have occurred regarding these matters.

*Fourth*, your claim that you do not understand the County's position regarding existence of the main residence ignores the County's satellite imagery analysis described in prior letters.  The information recently provided by your clients does not sufficiently establish that the current main residence predates permit requirements – in fact, as described by our prior correspondence, it appears clear that the main residence was substantially, if not entirely, rebuilt sometime around 2006, thereby triggering permitting and other regulatory requirements.

*Finally*, regarding your requests that County establish a revised schedule that provides "1) clarity in scope of the entire project, on a project-by-project basis, and 2) a collaborative timeline to address them that is a feasible relative to the tests required", I must emphasize the importance of addressing all aspects of development that has occurred on the Property in a comprehensive, holistic, manner.  The relevant regulatory requirements that limit the type and intensity of development allowed on the Property, and that require the protection of important agricultural and natural resources, necessitate such an approach.

We have clearly outlined the steps required to complete the permitting process in our prior correspondence.  Given the significant amount of time that has elapsed since we provided these instructions, the County does not intend to extend these timelines any further.

Sincerely,

Steve Monowitz
Director of Planning and Building

cc:   Pat Griffin, Fire Marshall
       Edgardo Diaz, Environmental Health

# EXHIBIT D

**COUNTY** OF **SAN MATEO**
COUNTY EXECUTIVE'S OFFICE

# San Mateo County

# Farmworker Housing Compliance Task Force

**Final Report**

**Date: February 7, 2025**

1

## Executive Summary

In the wake of the mass shooting incident at two farms on the coastside of San Mateo County in January 2023, the County created the Farmworker Housing Compliance Task Force comprised of inspection and compliance personnel from multiple County departments. The Task Force had two goals: (1) proactively identify and locate all farmworker housing on agricultural and ranch lands within the unincorporated area, whether permitted or illegally constructed; and (2) inspect such housing and work with property owners to ensure that all units comply with minimum health and safety standards. This report describes the Task Force's data collection, inspection and compliance process, public engagement efforts, and key learnings about the quantity and condition of employer-provided farmworker housing in the unincorporated area of the County.

**Key Findings:**

- Through records reviews and surveys, the Task Force identified 124 active agricultural and ranch operations in unincorporated San Mateo County.
- The Task Force determined that of the 124 operations, 56 operations provide farmworker housing.
- Through site inspections of those 56 operations, the Task Force identified 145 farmworker housing units occupied by an estimated 356 farmworkers.
- Most (80%+) farmworker units are comprised of structures intended for permanent dwelling such as manufactured and single-family homes.
- The majority of farmworker units (66%) met minimum health and safety standards, while 50 units (34%) did not meet those standards and required corrective action ranging from minor repairs (e.g., the installation of smoke detectors) to more extensive repairs (e.g., electrical and foundation).

**Key Outcomes:**

- The Task Force created a first-of-its kind dataset of the 145 farmworker housing units provided by employers in unincorporated areas, including type, condition, and number of farmworker residents.
  - Essential health and safety conditions were improved at 49 farmworker units serving approximately 84 farmworkers, including 63 farmworkers who did not have access to safe drinking water at the time of inspection.
  - One farmworker unit with significant unsafe conditions was yellow tagged and subsequently abandoned as a residence, with the farmworker household relocated to another compliant housing unit.
- Six unregistered operations housing 5+ farmworkers were discovered and referred to the process for registration and compliance with the State's Employee Housing Program, a mandatory program for employers providing housing to five or more employees.
- Dedicated staffing resources have been directed by Planning & Building and Environmental Health Services to assist property owners with legalization and construction of new, compliant farmworker housing.
- Based on its findings, the Task Force recommends a number of potential local actions that can support the legalization, rehabilitation, and permitted construction of farmworker housing, such as creating a Coastal Development Permit exemption for farmworker housing and passing a new ordinance to require small water systems serving farmworker units to submit to regular water testing.

## I.     Overview

On January 23, 2023, seven farmworkers were killed, and another critically injured in a mass shooting event at two farms on the coastside of San Mateo County. In addition to the loss of life and trauma to the survivors, the horrific tragedy brought to light the substandard housing and unsafe living conditions at the farms where the shootings occurred. The farmworkers had been living in illegally constructed and unpermitted employee housing that building officials later deemed too unsafe for human occupancy.

At the request of District 3 Supervisor Ray Mueller and other County leaders, multiple County departments came together to launch the Farmworker Housing Compliance Task Force in the aftermath of the shooting to ensure safe living conditions for farmworkers residing in employer-provided housing. The Task Force was a joint effort of San Mateo County's Planning and Building Department, Environmental Health Services, County Attorney's Office, and the County Executive's Office, along with input from the County's Department of Agriculture/Weights and Measures.

The Task Force had two primary goals. First, the Task Force set out to identify all farmworker housing units on agricultural and ranch lands in the unincorporated area, whether permitted or unpermitted and regardless of the number of farmworkers housed, as no such comprehensive database existed at the time. Second, through inspections and compliance efforts, the Task Force sought to ensure that all such housing met minimum health and safety standards.

In situations where inspectors found that essential health and safety standards were not met, the Task Force noticed the operators/landowners, provided guidance on all necessary corrections, and specified a timeframe within which the corrections had to be completed.

The Task Force's data-collection and inspection activities are now complete, and this report presents the findings and results of the Task Force's efforts, as well as a set of considerations for continuing efforts to enhance the supply of safe, quality farmworker housing units on agricultural and ranch lands in unincorporated San Mateo County.

## II.     Outreach to Operators and Data Collection

Prior to the formation of the Task Force, the County generally only had records of farmworker housing that was constructed with proper permitting, was registered under the State's Employee Housing Program, or where the County had received a complaint about living conditions. As a preliminary step, the Task Force thus had to develop an initial data collection process to identify all farmworker housing, whether permitted or not, on agricultural lands throughout the unincorporated county.

To compile a comprehensive list of existing agricultural operations and farmworker housing, the Task Force started conducting outreach in March 2023 to all operations and/or property owners registered or certified with local and state agencies under a range of agricultural programs and permits. Operators received a letter and survey requesting information on the number of farmworker housing units, if any, and the number of workers housed on site. The inspection teams reviewed, analyzed, and confirmed survey responses and contacted property owners and operators to verify the information and schedule consensual onsite inspections.

The survey process allowed the Task Force to build a current and comprehensive database of active agricultural and ranch operations in the unincorporated area, regardless of whether they provide employee housing or not. The Task Force identified a total of 124 operations located in the unincorporated area of the county. The geographic distribution of those operations is shown in Figure 1. Note that while most agricultural and ranch operations in the county are located in unincorporated areas, some operations are located within cities where the County does not exercise the same regulatory and inspection authority. Those operations were not included in the scope of the Task Force's work; however, the Task Force did share information about its procedures and methods with city partners.

3

**Figure 1. Agricultural Operations Subject to Task Force Evaluation**



## III.    Inspection Process

The Task Force conducted onsite inspections at all agricultural and ranch operations providing employee housing. Inspection teams were comprised of representatives from Code Compliance and Environmental Health Services as well as building inspectors to conduct onsite inspections. A representative from the Office of Community Affairs also provided language interpretation and farmworker outreach and support, as needed.

Inspections were conducted of all structures on each property known or suspected to be used to house employees, including residential single-family homes, multi-unit buildings, manufactured/mobile homes, and recreational vehicles, as well as non-traditional residential structures like converted barns. Structures confirmed to be occupied exclusively by the landowner or operator were not generally evaluated by the Task Force absent consent or other site-specific concerns. Before each inspection, the property owner and/or operator was informed of the scope and purpose of the inspection and the composition of the inspection team. In the end, every inspection of the Task Force was conducted with the consent of the property owner and/or operator and the affected tenants.

The inspections were based on conditions observed during the onsite visit and focused on essential health and safety standards related to:

- Septic system: appropriate disposal of sewage and wastewater
- Water supply: access to potable water within safe drinking/quality standards
- Egress/emergency exits: clear and accessible exits from living spaces in the event of an emergency
- Structural safety: adequate and safe construction as observed through visual inspection

4

- Electrical safety: no apparent hazardous conditions with electrical panel, outlets, wiring, and connections, as observed through visual inspection
- Primary heat source: access to basic heating (not including portable heaters)
- Smoke/carbon monoxide detectors: functional smoke and carbon monoxide detectors installed where required
- Ventilation: appropriate ventilation (particularly for gas appliances)

When the inspection team identified a housing unit that did not meet minimum health and safety standards in these areas, the team provided the operator written documentation of the specific findings and the corrections that would be needed, as well as a timeline by which corrections had to be made. The required timeline for the corrective work varied depending on the risk posed by the condition and the nature of the recommended repair, ranging from immediate (e.g., installation of smoke detectors) to up to 90 days or more (e.g., making structural changes to address emergency egress).

The Task Force aimed to minimize the risk of displacement of farmworkers as much as possible in recognition of the significant disruption such displacement would cause to farmworkers and their families. Accordingly, orders to vacate housing units were only considered where, in the judgment of inspectors, the risks to human life were so great that no one should continue living in the units until the unsafe conditions were remedied. When there was a risk of such displacement, the County worked with the local County Core Service Agency to make ready supports for any displaced individuals and families.

To reduce the risk of displacement, Task Force inspection teams similarly did not condition continued occupancy on full legalization of unpermitted housing units nor otherwise pursue enforcement against owners for failing to obtain or provide proof of applicable permits, so long as any required corrective actions were implemented. However, operators were encouraged to obtain necessary permits to legalize all units and were provided referrals to County Planning and Building and Environmental Health Services staff available to assist with the permitting process.

## IV.    Communications and Engagement

The Task Force sought to keep the public and stakeholders informed of the Task Force's efforts throughout its work in recognition of public concern regarding the condition of farmworker housing as well as the specific concerns of both farmworkers and operators about the impacts of onsite inspections. In all, the Task Force hosted or presented at thirteen community meetings, including meetings in Half Moon Bay and Pescadero before inspections began. Outreach for those meetings was conducted in partnership with community organizations specifically to reach farmworkers living in the community and was conducted in English, Spanish, and Chinese. In addition, the Task Force created a public informational website with frequently asked questions.

As inspections began, the Task Force continued to provide updates to the public at community meetings, including a number of presentations to the Farmworker Advisory Commission, one of the County's newest advisory commissions created to promote programs and policies that address the unmet needs of farmworkers in San Mateo County. In the summer of 2023, after receiving feedback about concern and confusion among agricultural operators about the scope of Task Force inspections, the Task Force hosted a series of meetings specifically targeted to operators. As a result of the input received during those meetings, the Task Force created a property owner information sheet that was made available to the public and to each property owner prior to every inspection.

In the summer of 2024, when most of the inspections had been completed, the Task Force hosted and presented at another series of community meetings, during which the Task Force both provided updates about inspection findings as well as presented and sought input on potential reforms and other measures that could be undertaken to support the legal renovation and construction of farmworker housing. Specifically, the Task Force presented at meetings of the Pescadero Municipal Advisory Council, the Agricultural Advisory Council, the Farm Bureau, the Farmworker Advisory Commission, and two additional meetings specifically targeting the farmworker community.

## V.    Inspection Findings

The Task Force's onsite inspections produced the most comprehensive set of data and information gathered to date on the number, type, and condition of employee housing units provided on agricultural lands.

### A. Farmworker Housing by the Numbers

The Task Force counted 56 operators (out of 124 total active operations) that provide farmworker housing on agricultural

5

or ranch lands in unincorporated San Mateo County. Inspections of each of those operations identified 145 farmworker housing units occupied by an estimated 356 farmworkers. Table 1 shows the regional distribution of farmworker housing by unincorporated area.

**Table 1. Geographic Distribution of Farmworker Housing by Region**

| Geographic Region | Number of Farmworker Housing Units | Number of Farmworkers |
|---|---|---|
| Midcoast | 24 | 49 |
| Unincorporated Half Moon Bay | 18 | 60 |
| San Gregorio | 18 | 38 |
| Pescadero | 73 | 171 |
| Other | 12 | 38 |
| **Total** | **145** | **356** |

Of the 56 operations that provide housing to at least one farmworker, 22 operations house five or more farmworkers, and 34 operations house four or fewer farmworkers (see Figure 2 on next page). The number of farmworkers who live on site is relevant because operations housing five or more farmworkers are regulated under the State's Employee Housing Act, which governs the construction standards, maintenance, and use of private employee housing facilities to assure the health, safety, and general welfare of the tenants. Under the Employee Housing Act, operators are subject to annual inspections by County Environmental Health Service's Employee Housing Program.

Through the Task Force's inspections, the County identified six operations that house five or more employees but were not enrolled in the Employee Housing Program at the time of inspection. In addition to having to complete any necessary corrections identified by the Task Force, those operators were referred to the process to legalize their units, apply for an employee housing permit, and otherwise comply with all requirements of the State Employee Housing Program, including being subject to annual health and safety inspection.

**Figure 2. Farmworker Occupancy by Property**



## B. Farmworker Housing by Type

While the Task Force inspected a wide range of housing unit types, the vast majority of the 145 farmworker housing units were structures intended to be permanent dwellings like manufactured/mobile homes, single-family homes, multi-family dwellings (e.g., duplex, triplex, etc.), and dormitories. The remainder was comprised of other types of structures such as converted barns, travel trailers (non-motorized), and recreational vehicles (RVs). Figure 3 shows the breakdown of farmworker housing unit type as identified by the Task Force.

6

In addition to farmworker housing units, inspection teams also inspected 32 vacant units and 12 units housing non-farmworker tenants. Data for those units can be found in Appendix A.

**Figure 3. Farmworker Housing Structure Type (145 Total Units)**

| Structure Type | Number of housing units |
|---|---|
| Manufactured/mobile home | 63 |
| Single family home | 40 |
| Multi-family dwelling (e.g., duplex, triplex, etc.) | 17 |
| Travel trailer (non-motorized) | 11 |
| Recreational vehicle/RV (motorized) | 3 |
| Barn or other structure | 3 |
| Dorm | 2 |
| Yurt | 2 |
| Other: Studio unit with access to communal facilities | 2 |
| Other: Yellow corrugated metal siding warehouse | 1 |
| Other: Portable construction office trailer | 1 |

Number of housing units

## C. Corrective Actions by the Numbers

The Task Force evaluated farmworker housing units for compliance with essential life, health, and safety standards, as described in Section III, above. Of the 145 farmworker housing units inspected, 65.5% (95 units) met the Task Force's safety standards, and 33.8% (49 units) required corrective actions but could remain occupied. One farmworker housing unit (0.7%) required such extensive corrective work that it was deemed imminently dangerous and was accordingly yellow tagged, meaning that residents could not continue to reside there unless the dangerous conditions were addressed. The operator in that case abandoned the unit rather than undertake corrective actions but relocated the farmworker household to another, compliant housing unit on the property.

**Figure 4. Inspection Findings**



Assessment
145 farmworker housing units

No corrective action required, 65.5%

Yellow tag, 0.7%

Corrective actions needed, 33.8%

Of the farmworker units requiring corrective action, the most frequently cited issues related to water supply (37 units), lack of CO/smoke detectors (24 units), septic system concerns (18 units), and wiring/electrical concerns (17 units) (note that a unit of housing may have required corrections in multiple categories). Figure 5 shows the frequency of all evaluation categories.

7

**Figure 5. Safety Evaluation Findings by Category**



With respect to water supply issues, in addition to evaluating any plumbing or connection issues with the water service to farmworker units, the Task Force also tested water samples for the presence of bacteria whenever the water source serving farmworker units was not already subject to regular testing and reporting under an applicable water permit. Through such testing, the Task Force identified water systems on properties serving an estimated 35 farmworker units that tested positive for coliform and/or *E. coli* bacteria, which pose a primary public health threat to the water users. In those cases, inspectors required operators to provide disinfection, make repairs, or install more permanent treatment of the water to eliminate any ongoing threat from bacteria in the water supply. Where appropriate, inspectors issued boil-water notices until mitigation or correction was completed.

Regarding the safety of the housing structures, the required corrective actions ranged from minor to more extensive. Examples of minor corrective actions include the installation of smoke and carbon monoxide alarms and the proper venting of appliances such as water heaters and stoves. Examples of more extensive corrective actions include the installation or modification of doors or windows in rooms used for sleeping to provide secondary emergency egress, electrical repairs, foundation repairs, and the installation or replacement of heating systems.

Through these compliance efforts, the Task Force ensured that property owners and operators undertook appropriate repairs for each of the 49 farmworker units identified by inspection as requiring corrective action.

## VI.  Conclusion and Recommendations

The Task Force's work to identify and inspect all farmworker housing on agricultural and ranch lands in unincorporated San Mateo County is the first effort of its kind at the county level. The data and the findings in this report paint the most comprehensive and accurate picture to date of the locations, quantity, and condition of farmworker housing on agricultural lands. The Task Force's goals from its inception were to not only ensure minimum habitability conditions for all farmworker housing units, but also to provide information and insight about the state of employee housing for farmworkers that can help inform current and future efforts to support the construction and maintenance of safe and healthy farmworker housing in San Mateo County. (For more information on other recent efforts undertaken by the County of San Mateo and other agencies to address the unmet needs of farmworkers, see Appendix B.)

With respect to possible future actions of the County along these lines, the Take Force offers the following recommendations based on its findings as well as input gathered through public engagement and community meetings:

1. **Increase compliance measures for safe drinking water.**
   Although inspections showed that most farmworker units already complied with essential health and safety standards at the time of inspection, one area in which additional compliance measures could be impactful is with respect to the regulation of water systems, specifically those serving fewer than five service connections and therefore not currently subject to existing water quality monitoring or oversight under State law. The Task Force recommends exploration of a local ordinance that would require minimum construction standards, an annual operating permit, and periodic sampling to confirm minimum water quality standards for such water

systems serving farmworker housing units.

2. **Support the legalization of existing units and legal construction of new units.**
   The Task Force believes that legalization of all existing farmworker units (and legal construction of all new units) is *the most effective* way to ensure that farmworker units are constructed safely, are designed to the durability standards of permanent dwellings, and are built to protect and support healthy conditions for farmworker residents, the community, and the surrounding environment. The legal construction and rehabilitation of housing of any type in the unincorporated coastside of San Mateo County, however, must navigate a number of legal, regulatory, and geographic constraints that do not exist for many bayside communities. While many of the legal and regulatory requirements are governed by State law and cannot be changed at the local level, the Task Force has identified potential measures at the local level that can facilitate the more efficient and expeditious construction and/or renovation of farmworker units.

   In particular, **potential legal changes** include: (1) reducing minimum size requirements for onsite wastewater treatment systems (OWTS), such as septic, that would allow a lower threshold for determining the minimum size of the system to more accurately reflect the actual demand presented by a proposed farmworker housing unit; and (2) pursuing an amendment to the Local Coastal Program that would establish a Coastal Development Permit exemption for farmworker employee housing projects in areas that will not impact coastal resources, as necessary to comply with the Coastal Act requirements (e.g., outside of sensitive habitat areas and their buffers, not visible from scenic roads, and not on prime soils where feasible).

   Additionally, **process changes** to better assist property owners and operators who seek to build, renovate or repair farmworker employee housing include the following efforts already under way: (1) updates to the County's one-stop reference manual, the Farm Labor Housing Guidebook, to provide a comprehensive and current description of permit requirements and procedures, along with detailed instructions on how to obtain assistance with the permit process from the departments of Planning & Building and Environmental Health Services; and (2) the addition of dedicated staff resources to both Planning and Building and Environmental Health Services to assist property owners with the permit and approval process, including water system and OWTS evaluation, and construction reviews for installations, upgrades, and repairs.

3. **Explore financial support for the construction and rehabilitation of farmworker units.**
   To address the potential financial obstacles to legal construction or rehabilitation of existing units for some operators, the Task Force recommends exploring a potential refresh of the Farmworker Housing Loan Program operated by the Department of Housing. That program, which to date has provided eight subsidized loans to develop and rehabilitate 16 farmworker housing units, has no remaining funds for additional loans at the time of this report.

## VII.  Resources and Information

For information about how to construct and rehabilitate legal farmworker housing, including the updated Farm Labor Housing Guidebook, as well as information about any new measures in this area that may be adopted by the County, visit the County's Farm Labor Housing Permit webpage.

The County remains committed to ensuring safe living conditions for farmworkers residing in employer-provided housing and encourages tenants and other concerned stakeholders with reportable information about unsafe housing conditions to make a report using the following methods:

1. To report matters regarding unsafe housing structures, contact the Planning & Building Department at (650) 363-7821.
2. To report matters regarding health, water, and sanitation, contact Environmental Services at (650) 363-4404 and/or FarmWorkerHousingSupport@smcgov.org.

In the coming months, the Office of Community Affairs will conduct targeted outreach to the farmworker community and other stakeholders to provide information on how to report unsafe conditions.

9

# Appendix A. Inspection Data

This appendix features data for all units inspected, including non-farmworker units. The three categories of occupancy featured include:

- "Farmworker housing" refers to a housing unit with one or more farmworker employees
- "Other tenant units" refers to housing units with tenants who were not identified as employees, including renters and guests
- "Vacant" refers to housing units that were vacant at time of inspection



Type of Structures by Occupancy Category
189 total units



Task Force Assessment by Occupancy Category
189 total units

**Task Force Assessment by Occupancy Category**

| Task Force Assessment | Farmworker Housing Units | Vacant at Time of Inspection | Other Tenant Units | Total Units | Percent of Total Units |
|---|---|---|---|---|---|
| Corrective actions necessary, and unit can remain occupied during this time | 49 | 6 | 5 | 60 | 31.7% |
| No corrective action required | 95 | 10 | 6 | 111 | 58.7% |
| Yellow tag - unsafe conditions were found that required restricted use of this unit | 1 | 1 | 1 | 3 | 1.6% |
| N/A (Not planned for habitation) | | 15 | | 15 | 7.9% |
| *Total* | 145 | 32 | 12 | 189 | 100% |

**Type of Correction Needed by Occupancy Category**

| Type of Correction Needed | Farmworker Units | Vacant Unit at Time of Inspection | Other Tenant Units | Total Units |
|---|---|---|---|---|
| Septic system | 18 | 4 | 3 | 25 |
| Water supply | 37 | 3 | 3 | 43 |
| Wiring/electrical | 17 | 2 | 4 | 23 |
| Egress/emergency exits | 8 | 1 | 0 | 9 |
| Structural safety issues | 8 | 3 | 1 | 12 |
| Primary heat source | 13 | 2 | 3 | 18 |
| CO/smoke detectors | 24 | 1 | 5 | 30 |
| Ventilation | 12 | 1 | 2 | 15 |

# Appendix B. Other Initiatives

## I.    Recent Affordable Housing Projects

### Stone Pine Cove (880 Stone Pine), Half Moon Bay

The County has been working on a long-term housing development called 880 Stone Pine Road in Half Moon Bay, an affordable manufactured home community developed in partnership with the City of Half Moon Bay offering ownership opportunities for 47 farmworker households, including those specifically displaced by the mass shooting of January 2023. The County is considering providing homeownership opportunities to agricultural workers making up to 80% of the area median income and will target extremely low-income households and displaced households from dilapidated housing conditions. The County anticipates occupancy to begin in Spring 2025. For more information, please visit the City of Half Moon Bay's Stone Pine Cove – Affordable Housing webpage.

### Cypress Point, Moss Beach

Affordable housing developer MidPen Housing is developing a 71-unit affordable housing community in Moss Beach. The project will consist of 16 one-bedroom, 37 two-bedroom, and 18 three-bedroom homes that are anticipated to serve approximately 210 residents. All units, apart from the manager's unit, will be rented to households that earn less than 60% of the area median income, of which 18 are reserved for low-income farmworker households. For more information, please visit the County of San Mateo's Cypress Point Affordable Housing Community Project webpage.

### 555 Kelly Avenue, Half Moon Bay

In partnership with ALAS (Ayudando Latinos a Sonar) and with financial support from the County, affordable housing developer Mercy Housing California (MHC) is slated to build 40 apartments of affordable housing for senior farmworkers on a parcel owned by the City of Half Moon Bay. The property will also be the future home of the Farmworker Resource Center, a new community center operated by ALAS. For more information, please visit the City of Half Moon Bay's 555 Kelly Avenue – Affordable Housing webpage.

## II.    Pescadero Housing Site Analysis

The County is conducting an analysis of sites within the Pescadero area to determine if there are properties that are suitable for the development of affordable housing. This assessment will include an in-depth study of sites that may be viable for this purpose, and identify potential barriers to such development posed by existing policies and regulations that could be amended to facilitate the development of farmworker housing in the area.

## III.    Office of Labor Standards and Enforcement (OLSE)

In December 2023, the Board of Supervisors voted unanimously to launch an Office of Labor Standards and Enforcement (OLSE) with specific attention to low-income workers and workers from vulnerable populations. The goal is to inform workers and employers about labor rights and increase adherence to wage per hour laws through increased awareness and enforcement. The OLSE will aim to strengthen worker protections by having in-house support to reinforce regional, state, and federal regulatory and educational strategies. The OLSE is currently in development, utilizing a phased approach to design and establish needed infrastructure.